# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HANGZHOU AILONG METAL PRODUCTS CO., LTD., <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br> *Defendant-Intervenor.* | Court No. 22-00116 <br><br> ***PUBLIC VERSION*** |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Hangzhou
Ailong Metal Products Co., Ltd.*

Dated:      August 22, 2022

# TABLE OF CONTENTS

**Page No.**

PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C) ...................... 1

   I. Administrative Determination to Be Reviewed ...................................... 1

   II. Issues of Law and Fact Presented .......................................................... 1

   III. Reasons for Contesting the Final Results ............................................ 2

   IV. Standard of Review ............................................................................... 3

STATEMENT OF FACTS ................................................................................... 4

ARGUMENTS ..................................................................................................... 7

   I. Introduction and Summary of Arguments ............................................ 7

   II. The Statute Provides Two Methods for Calculating the Normal  Value in an NME Proceeding ......................................................................... 9

   III. Commerce Unlawfully Used Raw Square Tube as the Raw  Material FOP for the Subject Merchandise .................................................................. 11

      a. Raw Square Tube Is Itself Subject Merchandise ............................................. 11

      b. Steel Plate Is the Raw Material FOP for Subject Merchandise .................... 13

   II. Commerce Unlawfully Used the Malaysian SV for Steel Tube........................ 15

      a. The Malaysian SV Is a Market Price of the Subject Merchandise................ 15

      b. Commerce's Use of the Malaysian SV Resulted in Unlawful Double Counting ................................................................................................. 18

      c. Commerce Unlawfully Rejected the Russian SV for Steel  Plate .................. 20

CONCLUSION.................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ausimont USA, Inc. v. United States,*
   882 F. Supp. 1087 (Ct. Int'l Trade 1995) ................................................................ 3

*Changzhou Wujin Fine Chem. Factory Co. v. United States,*
   701 F.3d 1367 (Fed. Cir. 2012) ................................................................................. 3

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
   467 U.S. 837 (1984) ................................................................................................... 3

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ................................................................................................... 3

*CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States,*
   Slip Op. 14-33 (Ct. Int'l Trade 2014) ..................................................................... 19

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................................................................... 3

*Hartford Fire Ins. Co. v. United States,*
   772 F.3d 1281 (Fed. Cir. 2014) ................................................................................. 4

*Lasko Metal Prods., Inc. v. United States,*
   810 F. Supp. 314 (Ct. Int'l Trade 1992) ............................................................ 14, 19

*Lasko Metal Prods., Inc. v. United States,*
   43 F.3d 1442 (Fed. Cir. 1994) ................................................................................. 19

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
   *716 F.3d 1370 (Fed. Cir. 2013)* .............................................................................. 15

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................................................... 3

19 U.S.C. § 1677b(c)(1) ................................................................................... 2, 7, 10, 11

19 U.S.C. § 1677b(c)(1)(B) ....................................................................................... 8, 14

19 U.S.C. § 1677b(c)(2) ............................................................................................. 8, 10

19 U.S.C. § 1677b(c)(2)(A) ................................................................ 8

19 U.S.C. § 1677b(c)(3)(B) ................................................................ 1


**Other Authorities**

*Certain Activated Carbon from the People's Republic of China: Final
    Results of Antidumping Duty Administrative Review; 2016-2017*, 83
    Fed. Reg. 53,214 (Dep't Commerce October 22, 2018) and
    accompanying Issues and Decision Memorandum ("*Activated
    Carbon IDM*") .................................................................................. 12

*Fresh Garlic from the People's Republic of China, Final Results and
    Partial Rescission of Antidumping Duty Administrative Review and
    Final Results of New Shipper Reviews*, 71 Fed. Reg. 26,329 (Dep't
    Commerce May 4, 2006) and accompanying Issues and Decision
    Memorandum ("*Fresh Garlic* IDM") ............................................. 20

**PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C)**

### I. Administrative Determination to Be Reviewed

Plaintiff Hangzhou Ailong Metal Products Co., Ltd. ("Plaintiff" or "Ailong") contests the final results of the administrative review of the antidumping ("AD") order on light-walled rectangular pipe and tube ("LWRPT") from the People's Republic of China covering the August 1, 2019 through July 31, 2020 period of review ("POR"). *See Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 Fed. Reg. 13,968 (March 11, 2022) ("*Final Results*") (PR 128). Plaintiff challenges the factual and legal conclusions of the U.S. Department of Commerce ("Commerce" or the "Department") in the *Final Results* as set forth in its "Issues and Decision Memorandum" and "Analysis Memo" for the *Final Results. See Issues and Decision Memorandum for the Final Results* (March 7, 2022) ("*Final IDM*") (PR 124); *see also Final Results Margin Calculation (March 7, 2022) ("Final Analysis Memo")* (PR 126).

### II. Issues of Law and Fact Presented

1. **Are square tubes a lawful raw material factor of production?**

   No, 19 U.S.C. § 1677b(c)(3)(B) identifies "raw materials employed" as a factor of production, not the finished good. Steel plate is the raw material employed to produce the finished good (square tubes).

2. **Was it lawful for Commerce to use Malaysian surrogate value ("SV") for steel tube?**

No, 19 U.S.C. § 1677b(c)(1) requires the valuation of factors "utilized in producing the merchandise." The surrogate value selected by Commerce reflects the value of merchandise comparable to the subject merchandise, not the value associated with producing the merchandise.

**3. Was Commerce's calculation of the normal value Lawful?**

No, by using the value of merchandise comparable to the subject merchandise rather than the raw material employed, Commerce unlawfully double-counted general expenses and profit plus the cost of containers, coverings, and other expenses.

**4. Was it lawful for Commerce to reject Ailong's steel plate FOP?**

No, Commerce failed to make an independent finding about the appropriate raw material used in the production of subject merchandise.

**5. Was it lawful for Commerce to reject the Russian SV for steel plate?**

No, Commerce failed to select the best available information.

### III. Reasons for Contesting the Final Results

Plaintiff contests the *Final Results* because Commerce's factual and legal conclusions are not supported by substantial evidence and otherwise not in accordance with the law. Commerce's use of square tube as a raw material in the production of subject merchandise is unlawful. Square tubes are the investigated product (subject merchandise) and the finished good. Finished subject merchandise cannot be considered a raw material used in the production of the same good. The use of a surrogate value for the finished good as a raw material cost unlawfully increased Plaintiff's AD rate. Plaintiff' reasons for contesting the *Final Results* are explained in detail below in the *Arguments* section of this Memorandum.

## IV. Standard of Review

The Court will hold unlawful agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Ausimont USA, Inc. v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995).  Substantial evidence means that there is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In applying its standard of review involving the Department's interpretation of a statute, the Court must do so within the framework established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, the Court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842-43). Commerce must act reasonably and may not be arbitrary and capricious. *See e.g.*, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("Commerce's decision will be set aside if it is arbitrary and capricious."). {A} clear error of judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable. (quoting *Robert Bosch LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (internal citations and quotations omitted) *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014).

## STATEMENT OF FACTS

Plaintiff Ailong is a Chinese exporter of subject LWRPT.  On October 6, 2020, Commerce initiated an administrative review of Plaintiff's LWRPT entered into the United States for the period from August 1, 2019 through July 31, 2020 (the "POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 63,081 (October 6, 2020).

During the POR, Ailong exported LWRPTs.  *See Ailong's Response to Section D Supplemental Questionnaire* (March 30, 2021) (PR 39; CR 23), at 6.  Ailong further processed (e.g., cutting, deburring, straightening, and hole punching) the LWRPTs before they were exported.  *See id.* at 8.

Both the unprocessed LWRPTs and the processed LWRPTs are properly classified under subheading 7306.61 of the Harmonized Tariff Schedule of the United States ("HTSUS").  *See Ailong's First SV Submission* (April 5, 2021) (PR 40), at Exhibit SV-1; *see also THD's Response to Petitioner's Comments on Ailong's U.S. Sales Data* (December 11, 2022) (PR 25; CR 16), at 3.  Articles classified in subheading 7306.61 are within the scope of the LWRPT Order.  *See Initial Questionnaire* (October 22, 2020) (PR 9), Appendix III ("Description of Products Under Review").  Therefore, both the unprocessed LWRPTs and the processed LWRPTs are within the scope of the LWRPT Order.  Throughout the administrative review, the unprocessed LWRPTs were referred to as "raw square tubes."  See e.g., *Final Decision Memo* (PR 124), at 2 & 6.

4

On December 7, 2020, Ailong submitted its section D questionnaire response and reported its own factors of production ("FOPs") including the consumption quantities for raw square tube used to produce the processed LWRPT. *See Ailong's Response to Section D Questionnaire* (PR 24; CR 11), at 22.

On April 5, 2021, Commerce issued a supplemental questionnaire instructing Ailong to revise the section D database to report the FOPs used by Ailong's unaffiliated suppliers to produce the raw square tube. *See Sections C and D Supplemental Questionnaire* (PR 48; CR 26).

On April 27, 2021, Ailong submitted its response to the Commerce's April 5, 2021 supplemental questionnaire. *See generally Ailong's Response to Sections C and D Supplemental Questionnaire* (PR 60; CR 27-30). Pursuant to Commerce's instructions, Ailong obtained the requested FOP information from an unaffiliated supplier and provided it to Commerce. *See id.* at 13 & 14. In the updated FOP database, Ailong replaced the consumption quantities for raw square tube with the consumption quantities for steel plate (which is used by the unaffiliated suppliers to produce the raw square tube). *See id.* at Exhibit D-26. For other factors of production such as energy and labor, Ailong provided the combined consumption rates for both Ailong and its unaffiliated supplier. *See id.*

On August 2, 2021, Ailong submitted Russian surrogate value ("SV") for steel plate that can be used by Commerce to value the steel plate consumption quantities

reported in the updated FOP database.  *See generally Ailong's Second SV Submission* (PR 63-69).

On August 31, 2021, Commerce issued the preliminary results of the administrative review and determined the dumping margin of 157.40 percent for Ailong.  *See Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 50,054 (September 7, 2021) (PR 106) ("Preliminary Results"); and the accompanying Preliminary Decision Memorandum (August 31, 2021) (PR 103) ("PDM"), Preliminary Analysis Memorandum (August 31, 2021) (PR 104; CR 42) ("Prelim Analysis Memo"), and Preliminary Surrogate Value Memorandum (August 31, 2021) ("Prelim SV Memo")* (PR 106).

In the Preliminary Results, Commerce stated that it used "{t}he factors of production (FOP) database in Ailong's April 27, 2021 (barcode 4115011-04) supplemental questionnaire response."  *Prelim Analysis Memo (PR 104; CR 42), at 2.*  The FOP database in Ailong's April 27, 2021 contained the consumption quantities for steel plate used by Ailong's unaffiliated supplier to produce the raw square tube.  *See Ailong's Response to Sections C and D Supplemental Questionnaire (PR 60; CR 27-30), at Exhibit 26.*

On March 7, 2022, Commerce issued the final results and confirmed the dumping margin of 157.40 percent for Ailong.  Commerce did not change the margin

calculation.  *See Final Results* (PR 128)*, and the accompanying Final IDM* (PR 124) *and Final Analysis Memo* (PR 126).

In the Final Results, Commerce used the raw square tube FOP and applied the Malaysian SV for steel tube.  *See Final IDM* (PR 124)*, at 6*; *see id.* at 4-6. Commerce explained that it used the raw square tube FOP because the most "reliable" SV information (i.e., Malaysian SV) was for steel tube.  *See id.* at 5. Commerce did not provide any independent reason for determining raw square tube as the appropriate FOP for the subject merchandise.

In the Final Results, Commerce responded to Ailong's claim of double counting and stated that it recognized "that the Malaysia SV data for square tube may include further processed square tube in addition to the raw square tube utilized by Ailong."  *See id.* at 6.  Commerce further stated that, despite this flaw, the Malaysian SV was the "best information on the record."  *See id.*

## **ARGUMENTS**

### I. Introduction and Summary of Arguments

In the *Final Results*, Commerce unlawfully used square tube as the raw material FOP in its calculation of normal value.  When subject merchandise is exported from a nonmarket economy such as China, the statute permits two methods for calculating normal value.  *See* 19 U.S.C. § 1677b(c)(1). The default method bases normal value on the quantity of raw materials, labor, energy and capital used in producing subject merchandise and value those elements in

7

surrogate countries.  *See id.* at § 1677b(c)(1)(B). The alternate method bases normal value on the price of comparable merchandise. *See id.* § 1677b(c)(2)(A).  The alternate method is only available as an option only when available information does not permit the calculation of the normal value under the default method (i.e., the factors of production method). *See id.* § 1677b(c)(2).

In the instant case, the statute requires the calculation of a normal value for square tube as square tube is the subject merchandise exported by Ailong.  It is undisputed that steel plate is used to produce square tubes and no party contested the reliability of the submitted steel plate FOP data used in the production of square tubes.  In these circumstances, the statutory framework provides two options.  Under the default method, Commerce may calculate normal value based on the quantity of raw materials (steel plates) used to produce square tubes. Commerce did not do that. Instead, Commerce based normal value on the price at which square tubes is sold in other countries, which is the alternate method based on the price of comparable merchandise.  Then, to compound its error, Commerce added additional cost elements associated with the default method, thereby creating an impermissible hybrid method.

Commerce also unlawfully resorted to the alternate method without making the required finding that the available information is inadequate for purposes of determining the normal value in accordance with the default method.  Surrogate value information for the steel plate FOP was placed on the administrative record and Commerce made no finding that the default method could not be used. In

8

addition, Commerce unlawfully rejected the surrogate values that could be used to value the steel plate FOP under the default method.

## II. The Statute Provides Two Methods for Calculating the Normal Value in an NME Proceeding

In AD proceedings involving non-market economies ("NMEs"), the statutory framework provides two methods for calculating the normal value: (1) the "default" method based on the factors of production ("FOPs") and the surrogate values ("SVs"); and (2) the "alternative" method based on a market price of the subject merchandise.  These methods are described in subsections 773b(c)(1) and (2) of the Tariff Act, as amended, as follows.

**19 U.S.C. § 1677b**
**(c) Nonmarket economy countries**
    **(1) In general** {*the default method*}
        (B)(a) the administering authority shall determine the normal value of the subject merchandise on the basis of the <u>value of the factors of production</u> utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the <u>values of such factors</u> in a market economy country or countries considered to be appropriate by the administering authority.

    **(2) Exception** {*the alternative method*}
        If the administering authority finds that the available information is inadequate for purposes of determining the normal value of subject merchandise under paragraph (1), the administering authority shall determine the normal value on the basis of the price at which merchandise that is—
    (A) <u>comparable to the subject merchandise</u>, and
    (B) produced in one or more <u>market economy</u> countries that are at a level of economic development comparable to that of the nonmarket economy country, is sold in other countries, including the United States.

9

19 U.S.C. § 1677b(c)(1) and (2)(emphasis and parentheticals added).

Under the default method, Commerce must consider the FOPs "utilized in producing" the subject merchandise, which include, among other items, the "quantities of raw materials employed." *Id.* at § 1677b(c)(1)(b)(a) and § 1677b(c)(3)(A). To calculate the value of raw material used in the NME country, Commerce must multiply the raw material FOP by the "surrogate value" which is either the price or cost of the raw material in a market country. *See id.* at § 1677b(c)(4).

Under the default method, Commerce is not permitted to calculate the normal value based on the surrogate value for the subject merchandise itself. The statute clearly mandates Commerce to value each FOP separately based on the surrogate value for that FOP. *Id.* at § 1677b(c)(1)(b)(a)("the values of <u>such</u> factors")(emphasis added). Moreover, the statute provides that the normal value shall be calculated by adding "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" to the value of the factors of production. *Id.* at § 1677b(c)(1)(B).

Under the alternative method, Commerce can use the surrogate value for the subject merchandise itself as it would represent the "price" of "merchandise that is comparable to the subject merchandise" in "one or more market economy countries." Id. *Id.* at § 1677b(c)(2). However, under this method, Commerce is not permitted to combine the price of comparable merchandise with "the value of the factors of production utilized in producing the merchandise" (such as the value of raw

material, labor, energy, utilities, and capital) and "amount for general expenses and profit plus the cost of containers, coverings, and other expenses" as described in § 1677b(c)(1).

### III. Commerce Unlawfully Used Raw Square Tube as the Raw Material FOP for the Subject Merchandise

### a. Raw Square Tube Is Itself Subject Merchandise

In the *Final Results*, Commerce used square tube as the raw material for the production of square tubes (i.e., subject merchandise.)  This was unlawful because the statute does not allow Commerce to use the subject merchandise itself as a cost element to produce the same product.

As explained above, the statute provides two methods for calculating the normal value in an NME country.  *See supra Part II*.  Under the default method, Commerce must calculate normal value based on raw materials, and other enumerated costs, used in producing the subject merchandise.  *Id*.  Under the alternative method, Commerce may use the market price of the subject merchandise without adding any other amounts.  *Id*.  The alternative method does not permit the addition of other enumerated costs because the price of comparable merchandise is already inclusive of those enumerated costs.

Commerce has consistently determined that a raw material cannot be subject merchandise.  For example, in *Certain Activated Carbon from China*, Commerce applied adverse facts available ("AFA") to a respondent because it failed to provide the FOPs from the "ultimate producer."  In that case, Commerce

11

determined that the respondent's supplier is not the ultimate producer because the raw material input used by the supplier is "itself subject merchandise." *See Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 53,214 (Dep't Commerce; Oct. 22, 2018), and accompanying Issues and Decision Memorandum ("*Activated Carbon IDM*") at Comment 1.

In the underlying administrative review, Commerce followed its established practice of requesting FOPs from the ultimate producer.  Section D of the initial questionnaire instructed that, "{i}f your company did not produce the merchandise under consideration, we request that this section be immediately forwarded to the company that produces the merchandise and supplies it to you or to your customers."  Initial Questionnaire (October 22, 2020) (PR 9), at D-2.  When Ailong responded that it produced the covered LWRPT using purchased raw square tubes, Commerce issued a supplemental questionnaire instructing Ailong to report the FOPs used by Ailong's unaffiliated suppliers to produce the raw square tube. *See Sections C and D Supplemental Questionnaire* (PR 48; CR 26).  Pursuant to Commerce's instructions, Ailong obtained the requested FOPs from an unaffiliated supplier and provided it to Commerce. *See Ailong's Response to Sections C and D Supplemental Questionnaire* (PR 60; CR 27-30) at 13 & 14.

In its final determination, Commerce used square tube as a raw material, despite the fact that square tube is, itself, the finished product. *See Final IDM* (PR

124), at 5.  Based on Commerce's standard, Ailong is not the ultimate producer of the subject merchandise because the input used by Ailong (i.e., square tube) is itself subject merchandise.  *See id.*  During the POR, Ailong exported LWRPTs that were produced by its unaffiliated suppliers.  *See Ailong's Response to Section D Supplemental Questionnaire* (March 30, 2021) (PR 39; CR 23), at 6.  Ailong further processed the LWRPTs before they were exported.  *See id.* at 8.  Both the unprocessed LWRPTs and the processed LWRPTs are classified under HTSUS subheading 7306.61 and within the scope of the LWRPT order.  *See Ailong's First SV Submission* (April 5, 2021) (PR 40), at Exhibit SV-1; *see also THD's Response to Petitioner's Comments on Ailong's U.S. Sales Data* (December 11, 2022) (PR 25; CR 16), at 3.  Commerce also explicitly found that the "raw square tube used for production actually falls within the scope description."  *See Preliminary Surrogate Value Memorandum* (September 7, 2021) (PR 105) at 2.

### b. Steel Plate Is the Raw Material for Subject Merchandise

In the Final Results, Commerce rejected the steel plate FOP provided by Ailong's unaffiliated supplier without any lawful explanation.  The only explanation was that Commerce used the steel tube FOP because it found that the Malaysian SV for steel tube "to be the most reliable information on the record."  *Final IDM* (PR 124), at 5.  However, Commerce did not provide any independent reason for determining raw square tube as the appropriate raw material FOP for the subject merchandise.

13

Commerce was unlawful in using the steel tube FOP based on the
"reliability" of the available SV information. As explained above, the Malaysian SV
for steel tube is a market price of the subject merchandise and cannot be used to
value any raw material input for the subject merchandise *regardless* of how
"reliable" it may be. The "reliability" only matters if the information is *relevant*.
Therefore, Commerce must first determine the appropriate raw material before
assessing the reliability of the available SV information.

Furthermore, as explained above, the statute does not permit Commerce to
use raw square tube as a raw material in the production of square tubes. *See supra
Part II*. Indeed, using a value based on the price of comparable merchandise is
resorting to the alternative method. *See id.* If Commerce uses raw square tube as
the raw material FOP under the default method, it cannot add additional costs
without double-counting. Even if there were SV information for "raw square tube"
that is exclusive of any further processing costs, it would still include the general
expenses and profit associated with sale of the subject merchandise. However,
under 19 U.S.C. § 1677b(c)(1)(B), Commerce must add general expenses and profit
to the value of the FOPs. Therefore, Commerce would be double counting those
amounts.

Commerce's discretion to select the best available information must be aimed
at calculating dumping margins as accurately as possible. *See Lasko Metal Prods.,
Inc. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 316–17 (1992); *see also
Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379*

*(Fed. Cir. 2013)* ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.").

In the current case, the appropriate raw material input is steel plate. Steel plate is the raw material used to produce the subject merchandise. Ailong purchased the subject merchandise, further processed, and exported the goods. The cost of further processing is captured in Ailong's other FOPs such as labor and energy. Therefore, the unaffiliated supplier's FOPs for production of raw square tube and Ailong's FOPs for further processing together represent non-distorted cost of production for the exported LWRPT.

## II. Commerce Unlawfully Used the Malaysian SV for Steel Tube

### a. The Malaysian SV Is a Market Price of the Subject Merchandise

The Malaysian SV is a market price of the subject merchandise and cannot be used to value raw materials used in the production of subject merchandise. A market price in a market economy country captures the full cost of production; selling, general and administrative expenses; financial expenses; and profit associated with the sale of the good. By definition, the market price is greater than the value of any individual cost components used in the manufacture of that good. Therefore, the market price of steel tube is greater than the value of any individual FOP used in the manufacture of the steel tube.

15

The merchandise subject to the LWRPT order is "certain welded carbon-quality light-walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm."  The scope provides that the subject merchandise "is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60." These HTS subheadings provide for nonalloy and alloy (other than stainless) welded rectangular pipe and tube having a wall thickness of less than 4 mm.  While the scope is defined by the written description, the HTS numbers are generally used to identify the subject merchandise for Customs purposes.  *See Initial Questionnaire* (October 22, 2020) (PR 9), Appendix III ("Description of Products Under Review").

During the POR of the administrative review at issue, Ailong exported certain LWRPTs.  They were manufactured by Ailong's unaffiliated suppliers and further processed by Ailong before exportation to the United States.  The further processing did not change the chemical composition or the wall thickness of the product.  Therefore, both the unprocessed LWRPT and the processed LWRPT are classified under 7306.61 and subject to the LWRPT Order.  *See Ailong's First SV Submission* (April 5, 2021) (PR 40), at Exhibit SV-1; *see also THD's Response to Petitioner's Comments on Ailong's U.S. Sales Data* (December 11, 2022) (PR 25; CR 16), at 3.

To value the steel tube, Commerce used the Malaysian SV for steel tube provided by Petitioner.  *See Final IDM* (PR 124)*,* at 5.  The SV was based on the Malaysian import data obtained from the Global Trade Information Services

database, commonly known as Global Trade Atlas ("GTA"). *See Petitioner SV Submission* (April 5, 2021) (PR 47, CR 24-25), at 2. It represented the average CIF import price of all merchandise classified under HTS 7306.61 from market economy countries that have not been found to provide export subsidies – USD [      ] per ton. *See id.* at Exhibit 1.

The Malaysian SV is a market price of the subject merchandise. At the six-digit level, it is exactly same as the subject merchandise (i.e., 7306.61). At eight or ten-digit level, the SV is inclusive of the subject merchandise. The SV is even higher that the market price of the subject merchandise because it includes the tube with a wall thickness of 4 mm or more. As seen in the chart below summarizing Ailong's exports to the U.S. market during the POR, the price is higher for the tube with a greater wall thickness.

| Wall Thickness (inch) | FOB Price (USD) | Quantity | FOB Price (USD) |
|---|---|---|---|
| [   ] | [      ] | [      ] | [      ] |
| [  ] | [      ] | [      ] | [      ] |

*See Ailong's Response to Sections C and D Supplemental Questionnaire* (PR 60; CR 27-30), at Revised Exhibit C.1. The Malaysian SV covers products that are comparable to the subject merchandise, i.e., LWRPT exported by Ailong. *See Final IDM* (PR 124), at 6.

Furthermore, the Malaysian SV is a market price in a market economy. It captures the full cost of production; selling, general and administrative expenses; financial expenses; and profit associated with sale of the subject merchandise. By

definition, the market price is greater than the value of any individual FOP used in the manufacture of the subject merchandise.

As explained above, the statute does not permit Commerce to use the market price of subject merchandise as the value of a FOP. *See infra Part II.* To use the market price, Commerce must determine that the available information is inadequate for purposes of determining the normal value under the default method. *See supra Part II.* Commerce did not make that determination. More importantly, Commerce used the market price of subject merchandise *as if* it were using the alternative method *and yet* added all those additional amounts permitted only under the default method. This hybrid method is impermissible under the statute.

### b. Commerce's Use of the Malaysian SV Resulted in Unlawful Double Counting

In the Final Results, Commerce unlawfully inflated the dumping margin for Ailong by valuing the steel tube FOP with the Malaysian SV for the subject merchandise and adding other costs for further processing. This, by definition, is double counting because the Malaysian SV already includes the cost of further processing. On top of that, Commerce also added general expenses and profit which are also already included in the SV for subject merchandise.

In the Final Results, Commerce conceded to double counting. In particular, Commerce recognized that "that the Malaysia SV data for square tube may include further processed square tube in addition to the raw square tube utilized by Ailong."

18

*Final IDM* (PR 124)*, at 6.  Commerce however used the Malaysian SV "even though this data set may contain some flaws." *See id.*  Commerce claimed that it "weighed this consideration in light of the other potential SV data (including, for example, the reliability of the Russia Datamyne data)" and determined that "the Malaysian data constitute the best available information on the record." *See id.*  To support this decision, commerce noted that "{w}hen weighing between two imperfect options, courts have recognized that it is within Commerce's discretion to determine which choice represents the best available information." *See id.*

However, Commerce's discretion to determine the best available information "must be in line with the overall purpose of the antidumping statute, which the Court of Appeals for the Federal Circuit has explained to be 'determining current margins as accurately as possible.'" *CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, Slip Op. 14-33 at 26 (CIT 2014) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); *see also Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994) ("{T}here is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so.").  "In calculating normal value in the NME context, the particular aim of the statute is to determine the non-distorted cost of producing such goods." *See Lasko Metal Prods., Inc. v. United States*, 16 CIT 1079, 1081, 810 F. Supp. 314, 316–17 (1992)

In prior cases, Commerce recognized and remedied the distortive effective of doubling counting when valuing a raw material FOP.  For example, in *Fresh Garlic from China*, Commerce found that the surrogate value for garlic bulbs based on Indian import statistics covered fully processed and packed garlic and already accounted for the value of further processing. *See Fresh Garlic from the People's Republic of China, Final Results and Partial Rescission of Antidumping Duty Administrative Review and Final Results of New Shipper Reviews*, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) and accompanying IDM at 14.

### c. Commerce Unlawfully Rejected the Russian SV for Steel Plate

In the Final Results, Commerce unlawfully rejected the Russian SV for steel plate provided by Ailong.  *See Final IDM* (PR 124), at 5.  Instead, Commerce used the Malaysia SV for steel tube to value the FOP for raw square tube used by Ailong in its further processing operations.  *See id.*

As demonstrated above, raw square tube is not a lawful raw material for the subject merchandise.  As such, the Malaysian SV for steel tube is not a lawful SV for a raw material.  The statute does not allow Commerce to use those FOP and SV under the default method of calculating the normal value in an NME country.  *See infra Part II.*

In this case, the only available information on the legally permittable raw material input was the steel plate FOP data provided by Ailong's unaffiliated supplier for production of the square tubes (i.e., subject merchandise).  As such, the

best available information for valuing the steel plate FOP was the Russian SV for steel plate. Commerce's failure to use the Russian SV for steel plate was unlawful.

Even if *arguendo* Commerce could justify its rejection of the Russian SV, such rejection would have resulted in an inadequate record for calculating the normal value under the default method. In that case, Commerce should have used the alternative method which would allow it to use the market price for steel tube but, without adding any other amounts. However, Commerce failed to make that finding. Therefore, Commerce was unlawful in rejecting the Russian SV for steel plate and still calculating the normal value under the default method using the Malaysian SV for steel tube.

## **CONCLUSION**

For the reason discussed in this brief, we respectfully request that the Court remand the case to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Hangzhou
Ailong Metal Products Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 5099 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

Daniel Cannistra