NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| HANGZHOU AILONG METAL PRODUCTS CO., LTD., <br><br>       Plaintiff, <br><br>   v. <br><br> UNITED STATES, <br><br>       Defendant, <br><br>    and <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br>       Defendant-Intervenor. |

Before: Hon. Mark A. Barnett,
     Chief Judge

Court No. 22-00116

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 2-3 and 9

<u>**RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Nicole C. Hager, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Tubular Products Inc.*

Dated: December 16, 2022

Ct. No. 22-00116                                    NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ........................................................................................1

       A.     Ailong's Factors of Production ................................................................1

       B.     Valuing Ailong's FOP ...............................................................................3

III.   SUMMARY OF ARGUMENT ................................................................................7

IV.    ARGUMENT ............................................................................................................8

       A.     Commerce's Decision to Value Ailong's Raw Steel Tube Input
              Using a Surrogate Value for Raw Steel Tube Was Supported by
              Substantial Evidence .................................................................................9

       B.     The Surrogate Value Data That Ailong Submitted to Value Hot-
              Rolled Plate Was Fatally Flawed ...........................................................11

V.     CONCLUSION.......................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Longkou Haimeng Mach. Co. v. United States*,
    33 CIT 603, 617 F. Supp. 2d 1363 (2009) ...................................................................15

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014).........................................................................14, 15

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)...............................................................................14

*Sao Ta Foods Joint Stock Co. v. United States*,
    425 F. Supp. 3d 1314 (Ct. Int'l Trade 2020) ........................................................10

*T.T. Int'l Co. v. United States*,
    439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ........................................................15

*Zhengzhou Harmoni Spice Co. v. United States*,
    33 CIT 453, 617 F. Supp. 2d 1281 (2009) ............................................................10

**Statutes**

19 U.S.C. § 1677a ....................................................................................................1

19 U.S.C. § 1677b ....................................................................................................1

19 U.S.C. § 1677b(c) ...............................................................................................1

19 U.S.C. § 1677b(c)(1) .........................................................................................10

19 U.S.C. § 1677b(c)(2) .........................................................................................10

19 U.S.C. § 1677b(c)(3) .......................................................................................1, 10

19 U.S.C. § 1677b(c)(4) ........................................................................................2, 3

19 U.S.C. §§ 1677f-1(d) ...........................................................................................1

**Regulations**

19 C.F.R. § 351.301(c)(3)........................................................................................14

19 C.F.R. § 351.408(c)(2)........................................................................................16

NON-CONFIDENTIAL VERSION

**Administrative Materials**

*Certain Ball Bearings and Parts Thereof From the People's Republic of China*,
    68 Fed. Reg. 10,685 (Dep't Commerce Mar. 6, 2003) ............................................................9

*Certain Helical Spring Lock Washers from the People's Republic of China*,
    70 Fed. Reg. 28,274 (Dep't Commerce May 17, 2005) ......................................................10

*Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into
    Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033
    (Dep't Commerce June 27, 2017) ............................................................................................9

*Emulsion Styrene-Butadiene Rubber From the Russian Federation*,
    87 Fed. Reg. 69,002 (Dep't Commerce Nov. 17, 2022) .....................................................15

*Polyvinyl Alcohol from the People's Republic of China*,
    68 Fed. Reg. 47,538 (Dep't Commerce Aug. 11, 2003) .....................................................9

## I.      INTRODUCTION

On behalf of Nucor Tubular Products Inc. ("Nucor Tubular"), we respectfully submit this response to the August 22, 2022 opening brief of plaintiff Hangzhou Ailong Metal Products Co., Ltd. ("Ailong"). *See* Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (Aug. 22, 2022), ECF No. 25 ("Ailong's Brief"). Nucor Tubular adopts the arguments made in the United States' November 22, 2022 response brief. Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (Nov. 22, 2022), ECF No. 31 ("Government's Brief"). In this brief, Nucor Tubular provides additional context and arguments to aid the Court's understanding in Ailong's appeal.

## II.      STATEMENT OF FACTS

Below, Nucor Tubular provides factual background pertinent to this appeal.

### A.      Ailong's Factors of Production

Normally, to calculate antidumping duty margins, the U.S. Department of Commerce ("Commerce") compares the prices at which respondent companies sell goods in the United States ("export price") against the above-cost prices that they charge for the same or similar goods in their home market ("normal value"). *See, e.g.*, 19 U.S.C. §§ 1677f-1(d), 1677a, 1677b. In proceedings involving non-market economies like the People's Republic of China ("China"), however, home-market prices are considered distorted by government interference in the market. Commerce accordingly determines normal value by first identifying the respondent's "factors of production" or "FOP." *See id.* § 1677b(c). These consist of the raw materials used by a respondent to produce exported subject merchandise, along with inputs such as labor and energy, with additional values for financial factors such as selling expenses and profit. *See id.* § 1677b(c)(3).

The agency collects information on the respondents' usage rates for FOPs, and then seeks surrogate market-economy values for them, which it uses to calculate normal value. *See id.* § 1677b(c)(4).

Consistent with this approach, Commerce's initial antidumping questionnaire explained that the agency would use Ailong's FOP to construct the value of the light-walled rectangular pipe and tube ("LWR") that Ailong sold in the United States, and requested that Ailong identify the raw materials that it used to produce the goods it shipped. Antidumping Request for Information, *Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, Section D (Oct. 22, 2020) at D-1, P.R. 9. In response, Ailong reported that its exported LWR had only "one kind of raw material, *i.e.* {} raw square tube." Letter from Gaopeng & Partners to Sec'y Commerce, re: *Administrative Review of the Antidumping Order on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Section D Questionnaire Response* (Dec. 7, 2020) at 18, P.R. 24, C.R. 11-15 ("Ailong's Section D Questionnaire Response").

In response to a supplemental questionnaire, Ailong clarified that its production operations consisted of "further processing . . . . purchased [                    ]." Letter from Gaopeng & Partners to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Response to Section D Supplemental Questionnaire* (Mar. 30, 2021) at 8, P.R. 39, C.R. 23 ("Ailong's March 30 Supplemental Questionnaire Response"). This further processing added "significant value" to the purchased material and consisted of activities such as "[

                    ]." *Id.* According to Ailong, the export price of the subject merchandise was "more than [        ] of the purchase price of the [                    ]." *Id.* Ailong initially asked Commerce to calculate normal value based on its usage of the [                    ] that it purchased. *Id.*

**BUSINESS PROPRIETARY INFORMATION**
                                     **HAS BEEN DELETED**

In another supplemental questionnaire response, Ailong confirmed that the [

] that it purchased were produced in China and provided the identity and consumption

quantities for each material that its main supplier used to manufacture the input. Letter from

Gaopeng & Partners to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty*

*Order on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Response*

*to Section C&D Supplemental Questionnaire* (Apr. 27. 2021) at 13, P.R. 60, C.R. 27-30. The [

] was hot-rolled carbon steel

plate. *Id.* Ailong submitted a consolidated database combining its FOP with the materials of its

main unaffiliated [                    ] supplier. *Id.* at 13-14, Exhibit D-26.

## B.   Valuing Ailong's FOP

In proceedings involving non-market economies such as China, Commerce relies on

surrogate values, obtained from market economies, to value respondents' FOP. *See* 19 U.S.C.

§ 1677b(c)(4). Here, Commerce provided the parties with a list of six market economy countries

deemed economically comparable to China, and then invited the parties to submit information

from these or other market economies for its consideration in valuing Ailong's FOP. Letter from

Howard Smith, Program Manager, AD/CVD Operations, Off. IV, Enf't and Compliance, to

All Interested Parties, re: *Administrative Review of the Antidumping Duty Order on Light-Walled*

*Rectangular Pipe and Tube from the People's Republic of China: Request for Economic*

*Development, Surrogate Country, and Surrogate Value Comments and Information* (Mar. 18,

2021), P.R. 34 ("Commerce Request for SV Information").[1]

Nucor Tubular advocated for Commerce to select Malaysia as its primary surrogate

country, and subsequently submitted Malaysian import data for raw square tube. Letter from Wiley

---

[1]     The six countries were Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.

Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Comments on Surrogate Country Selection* (Mar. 29, 2021) at 1-4, P.R. 38; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Submission of Surrogate Values* (Apr. 5, 2021) at 2, Exhibit 1, P.R. 47, C.R. 24-25 ("Nucor Tubular's SV Submission"). Nucor Tubular obtained this information from the Global Trade Information Services database (commonly known as Global Trade Atlas ("GTA")), a source that Commerce has long deemed to provide reliable information for surrogate valuation purposes. *See, e.g.*, Nucor Tubular's SV Submission at 2, Exhibit 1.

For its part, Ailong provided Russian surrogate value data, which included Russian import data for hot-rolled carbon steel plate sourced from the Datamyne Global Trade Analytics subscription database ("Datamyne"), but no data for valuing raw square tube. Letter from Gaopeng & Partners to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: 2nd Submission of Surrogate Values* (Aug. 2, 2021) at Exhibit SV-12, Exhibit SV-13, P.R. 63-69 ("Ailong's Russian SV Submission").[2] Nucor Tubular submitted rebuttal information and pre-preliminary comments to show the unreliability of the Russian data. *See generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Rebuttal Surrogate Value Information* (Aug. 12, 2021), P.R. 83 ("Nucor Tubular's Rebuttal SV Submission"); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular*

---

[2]     Ailong also provided certain Romanian surrogate value data. *See, e.g.,* Letter from Gaopeng & Partners to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Submission of Surrogate Values* (Apr. 5, 2021) at 1, Exhibit 1, P.R. 41-46. However, Ailong ultimately advocated for Russia's selection as the primary surrogate country in its agency case brief, and does not advocate for reliance on Romanian data on appeal. Thus, Nucor Tubular does not address the Romanian data in this submission.

*Pipe and Tube From the People's Republic of China: Comments in Advance of the Department's Preliminary Results* (Aug. 6, 2021) at 10-12, P.R. 82, C.R. 31 ("Nucor Tubular's Pre-Prelim. Comments"). This included Russian import data for hot-rolled carbon steel plate released by GTA and the United Nations Commodity Trade Statistics database ("COMTRADE"), for the first five months of the period of review ("POR"), *i.e.*, August-December 2019.[3] *See generally* Nucor Tubular's Rebuttal SV Submission.

In its preliminary results, Commerce selected Malaysia as the primary surrogate country, finding that Malaysia provided the best available information to value Ailong's FOP. *See* Preliminary Decision Memorandum accompanying *Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 86 Fed. Reg. 50,054 (Dep't Commerce Sept. 7, 2021) (prelim. results of the antidumping duty admin. rev.; 2019-2020) at 5-10, P.R. 103 ("Prelim. Decision Memo"). Commerce explained that unlike the Russian data, the Malaysian surrogate value data were sourced from GTA, "Commerce's preferred source for {surrogate value} data." *Id.* at 9. Commerce also noted that the Malaysian surrogate value data included values for raw square tube, "the main input to produce subject merchandise." *Id.* By contrast, the Russian data was both less reliable and less specific, as it was not obtained from Commerce's preferred data source, and contained no values for raw square tube. *See id.*; *see also* Memorandum from Thomas Hanna, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. IV Enf't and Compliance, through Stephen Bailey, Program Manager, AD/CVD Operations, Off. IV Enf't and Compliance, to The File, re: *2019-2020 Antidumping Duty Administrative Review of Light-Walled Rectangular*

---

[3]      At the time that Nucor Tubular submitted its rebuttal information, Russia had not yet released its 2020 import data to GTA or COMTRADE. Letter from Wiley Rein LLP to Sec'y Commerce, re: *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Rebuttal Brief* (Oct. 25, 2021) at 9, 11, P.R. 117, C.R. 51 ("Nucor Tubular's Rebuttal Brief").

*Pipe and Tube from the People's Republic of China: Hangzhou Ailong Metal Products Co., Ltd.*
*Preliminary Surrogate Value Memorandum* (Aug. 31, 2021) at 2-3, P.R. 105.

Ailong and Nucor Tubular timely submitted case and rebuttal briefs. Letter from Crowell
& Moring LLP to Sec'y Commerce, re: *Administrative Review of the Antidumping Duty Order on*
*Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Case Brief* (Oct.
14, 2021), P.R. 114, C.R. 50 ("Ailong's Case Brief"); Nucor Tubular's Rebuttal Brief. Ailong
argued that Commerce should select Russia as the primary surrogate country, and should in any
case rely on Russian hot-rolled steel prices in valuing Ailong's exported LWR. *See generally*
Ailong's Case Brief. Nucor Tubular advocated for continued reliance on Malaysian data. Nucor
Tubular's Rebuttal Brief at 6. In so doing, Nucor Tubular pointed out that valuing Ailong's goods
based on a surrogate value for raw square tube, rather than hot-rolled carbon steel, made sense
given Ailong's production process. *Id.* at 2-6. The Russian surrogate data favored by Ailong lacked
any value for raw square tube; moreover, those data were aberrational. *Id.* at 6-12.

In the Final Results, Commerce continued to use Ailong's own FOP—rather than those of
its main supplier—to value the company's key steel input. *Light-Walled Rectangular Pipe and*
*Tube From the People's Republic of China*, 87 Fed. Reg. 13,968 (Dep't Commerce Mar. 11, 2022)
(final results of antidumping duty admin. rev.; 2019-2020), P.R. 128 ("Final Results") and
accompanying Issues and Decision Memorandum at 4-6, P.R. 124 ("I&D Memo"). The agency
explained that its preliminary valuation method more closely reflected Ailong's production
experience than would reliance on its suppliers' inputs. *Id.* at 4. Further, the record demonstrated
that there were serious flaws in the data that Ailong had submitted for use in valuing its suppliers'
hot-rolled steel. *Id.* at 5. In particular, the record disclosed significant discrepancies between the

quantity and value of the Datamyne information on Russian imports of hot-rolled steel plate and COMTRADE and GTA data for such imports. *Id.*

## III.   SUMMARY OF ARGUMENT

This Court should deny Ailong's motion for judgment on the agency record and affirm Commerce's Final Results. As noted in the Government's Brief, Ailong misconstrues and misstates the manner in which Commerce calculated normal value. Nonetheless, Ailong appears to challenge the Final Results on two grounds. First, it seems to argue that Commerce should not have valued Ailong's raw square tube input directly, but should have relied on the materials and usage rates obtained from Ailong's unaffiliated input supplier. Second, it seems to assert that Commerce should have relied on the Russian surrogate value data for hot-rolled steel plate instead of the Malaysian data for square tubes. Both claims are flawed.

First, Commerce appropriately valued the raw tube that Ailong used to produce the subject merchandise using a surrogate value for such tube, rather than surrogate values for the inputs into that tube. This valuation methodology appropriately reflected Ailong's production experience, operational setup, and pricing structure, as well as its further processing of raw square tube for export to the United States. Contrary to Ailong's arguments, the Tariff Act of 1930 ("the Act") does not prohibit Commerce from directly valuing an input that, if exported directly to the United States, would itself be subject merchandise. Moreover, Ailong's concerns about double counting are misplaced.

Second, not only was there no Russian data available on the record for directly valuing raw square tube, the only data that Ailong submitted for valuing hot-rolled steel—Datamyne data from Russia—was from an unknown source and demonstrably inaccurate. Ailong could have put hot-rolled steel data from other sources or countries on the record, including Malaysia, but chose

not to do so. Ailong also fails to account for the fact that Commerce prefers to value all FOP in one surrogate country. Malaysia offered relevant financial statements, as well as contemporary and appropriate surrogate values for all FOP. Russian financial statements, however, were less specific to subject goods than the Malaysian statements on the record.

## IV.   <u>ARGUMENT</u>

Like the Government, Nucor Tubular understands Ailong's arguments ultimately to be that (1) Commerce should have relied on the FOP of Ailong's unaffiliated input supplier to value the raw square tube that Ailong consumed, rather than valuing that tube directly, and (2) Commerce should have used Russian surrogate value data for hot-rolled steel instead of the Malaysian data for square tubes. *See* Government's Brief at 9. Ailong argues that the agency is prohibited from directly valuing a purchased input (here, the raw square tube) where that input, if exported to the United States, would itself be within the scope of an antidumping order. For the reasons explained below and in the Government's Brief, Commerce was empowered to value Ailong's actual, direct inputs in calculating normal value. Further, even if Ailong's argument had facial merit, Ailong fails to grapple with its decision not to submit data that would have allowed Commerce to implement Ailong's proposed valuation methodology. It also fails to recognize and give due weight to Commerce's reasonable preference for valuing all FOP within a single surrogate country.

### A.   Commerce's Decision to Value Ailong's Raw Steel Tube Input Using a Surrogate Value for Raw Steel Tube Was Supported by Substantial Evidence

During the underlying review, Ailong reported that it used square tube as its "only" raw material in producing subject merchandise. *See* Ailong's Section D Questionnaire Response at 18. Indeed, Ailong initially requested that Commerce calculate normal value using [          ] as an FOP. *See* Ailong's March 30 Supplemental Questionnaire Response at 8.

Commerce reasonably valued Ailong's exported LWR based on the square tube that was Ailong's main input, in addition to FOP corresponding to Ailong's further processing of that input (labor, etc.). *See* I&D Memo at 4. This approach made sense given Ailong's production experience, operational setup, and pricing structure, all of which reflected Ailong's purchase and further processing of square tube. Commerce's approach was also consistent with its "normal practice {of} valu{ing} purchased components and not the input factors used to produce them if the firm is not integrated." *Cf.* Issues and Decision Memorandum accompanying *Certain Ball Bearings and Parts Thereof From the People's Republic of China*, 68 Fed. Reg. 10,685 (Dep't Commerce Mar. 6, 2003) (notice of final deter. of sales at less than fair value) at 36; *see also* Issues and Decision Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From the People's Republic of China*, 82 Fed. Reg. 29,033 (Dep't Commerce June 27, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2014-2015) at 22 (noting that the agency values the input purchased, unless the available surrogate value information is so unsuitable that a using a build-up method to value the input if preferable); Issues and Decision Memorandum accompanying *Polyvinyl Alcohol from the People's Republic of China*, 68 Fed. Reg. 47,538 (Dep't Commerce Aug. 11, 2003) (notice of final deter. of sales at less than fair value) at 7-9 (valuing input purchased by respondent based on surrogate value relevant to that input, rather than on a buildup of surrogate values for the inputs of the supplier that produced

the input); Issues and Decision Memorandum accompanying *Certain Helical Spring Lock Washers from the People's Republic of China*, 70 Fed. Reg. 28,274 (Dep't Commerce May 17, 2005) (final results of antidumping duty admin. rev.) at 13-15 (valuing plating services based on a price quote for plating, rather than on the plating subcontractor's material inputs and usage rates).

Ailong argues that that the Act prohibits Commerce from valuing an input as an FOP if that FOP falls within an order's scope description. Ailong's Brief at 16–18. Ailong argues that, pursuant to 19 U.S.C. § 1677b(c)(3), an item cannot be both a "raw material" FOP and subject merchandise at the same time. *Id.* at 11. According to Ailong, where a respondent uses an input that itself would qualify as subject merchandise if exported directly to the United States, Commerce must either rely on the market price of comparable merchandise under what Ailong calls the "alternative method" contemplated in 19 U.S.C. § 1677b(c)(2) or value the FOPs into the component. *See id.* at 11, 15.

As the Government cogently explains, Government's Brief at 12-14, Ailong's claim is unpersuasive. The Act does not define either "FOP" or "raw material" so as to exclude inputs that might themselves qualify as subject merchandise. 19 U.S.C. §§ 1677b(c)(1), (c)(3). Moreover, Commerce has wide discretion in identifying and valuing appropriate FOP. *See Sao Ta Foods Joint Stock Co. v. United States*, 425 F. Supp. 3d 1314, 1322 (Ct. Int'l Trade 2020). As such, the agency is empowered to "define{} the . . . FOPs based on information that it uncovers in an investigation or review and {to} select{} the best available information to value that FOP . . . ." *Id.* This Court has also held that the alternative methodology for calculating normal value provided in 19 U.S.C. § 1677b(c)(2) neither demands an "all or nothing" approach as Ailong suggests nor limits Commerce's discretion in identifying FOP. *See Zhengzhou Harmoni Spice Co. v. United States*, 33 CIT 453, 461-64, 617 F. Supp. 2d 1281, 1292-93 (2009).

Beyond its statutory claim, Ailong contends that valuing square tube as an FOP led to double counting. Ailong's Brief at 14, 17. Ailong notes that the surrogate value for square tube presumably reflected the selling, general, and administrative expenses ("SG&A expenses") and profit associated with the sale of square tube. *Id.* But Commerce also included surrogate values for SG&A expenses and profit in its build-up of Ailong's normal value. *Id.* Accordingly, per Ailong, Commerce's methodology overstates SG&A expenses and profit. But even if this were the case, it is Ailong's own fault. As explained below, Ailong's submission of only unreliable Russian data to value its suppliers' main input left Commerce with little choice but to rely on the Malaysian data for raw square tube. *See* discussion *infra* at Section IV.B. Commerce duly recognized the potential for double-counting inherent in this data's use, but reasonably chose to rely on the Malaysian data given the clear unreliability of the alternative data for which Ailong advocated. I&D Memo at 6.

In sum, Commerce sufficiently explained why it valued Ailong's consumption of square tube using a surrogate value for square tube. Ailong's arguments that the statute barred Commerce from adopting this approach are unavailing. Its arguments regarding double-counting are likewise unpersuasive, and fail to appropriately recognize the unreliability of the alternative data that Ailong championed.

**B.**    **The Surrogate Value Data That Ailong Submitted to Value Hot-Rolled Plate Was Fatally Flawed**

During the review, Commerce issued a list of six market economy countries that it deemed economically comparable to China, and invited the parties to submit information from these or other economies for its consideration in valuing Ailong's FOP. *See generally* Commerce Request for SV Information. Ailong submitted Datamyne data on Russian prices for hot-rolled carbon steel plate and scrap, but no similar Russian data for valuing raw square tube. *See, e.g.*, Ailong's Russian

SV Submission at Exhibit SV-12, Exhibit SV-13. To demonstrate that the Russian Dataymine data did not provide reliable or accurate values for hot-rolled steel or scrap, Nucor Tubular submitted information including GTA and COMTRADE data for Russian imports of hot-rolled carbon steel plate and scrap during the first five months of the POR, *i.e.*, August-December 2019. *See generally* Nucor Tubular's Rebuttal SV Submission; *see also supra* note 3.

Commerce ultimately declined to rely on the Russian Datamyne information, noting that it was (1) not from its preferred data source (GTA), (2) not from the primary surrogate country, (3) not specific to the direct input into Ailong's production (raw square tube) and (4) inconsistent with other record information regarding the quantity and value of carbon steel plate imported into Russia during the POR. I&D Memo at 5; *see also* Nucor Tubular's Rebuttal Brief at 9, 11. Commerce's basis for rejecting the Dataymyne information made sense.

As an initial matter, not only was Datamyne not GTA, it was not clear how, or from where, the Datamyne data were collected. Ailong's surrogate value submissions labeled the source of the Russian hot-rolled data as "GTA," the same abbreviation typically used to refer to Commerce's known and trusted source for surrogate values. *See* Ailong's Russian SV Submission at Exhibit SV-12. However, the data was not from GTA (*i.e.*, Global Trade Atlas), but from the separate Datamyne "Global Trade Analytics" database. *See* Nucor Tubular's Pre-Prelim. Comments at 11; Nucor Tubular's Rebuttal Brief at 7. While GTA's data collection methods are well known, Ailong did not provide any information regarding where or how the Datamyne information was collected. *See* Nucor Tubular's Pre-Prelim. Comments at 11; Nucor Tubular's Rebuttal Brief at 7. In other words, Ailong provided Commerce with no way of knowing where the information originally came from, if it was accurate, or even if it was publicly available.

Moreover, the Datamyne data were unreliable. The Russian hot-rolled steel price sourced from Datamyne—$192.81 per metric ton—was significantly lower than global hot-rolled prices during the POR as well as historical prices in Russia. *See* Nucor Tubular's Rebuttal SV Submission at 3-5. Indeed, the international publication *Steel Business Briefing* showed that Russian hot-rolled pricing in 2020 was more than double the Datamyne price, at approximately $430.00 per metric ton. Nucor Tubular's Rebuttal Brief at 8. That publication also indicated that hot-rolled pricing during the POR in other countries that Commerce found economically comparable with China was also significantly higher than the Datamyne price: Turkey ($461.00 per metric ton), Brazil ($590.00 per metric ton), and southeast Asia (including Malaysia) ($449.00 per metric ton). *See id.*; *see also* Commerce Request for SV Information at Attachment 1. *Steel Business Briefing* additionally indicated that Russian hot-rolled prices had never fallen below $200 per metric ton at any time in the twenty years prior to the POR. Nucor Tubular's Rebuttal Brief at 8.

Nucor Tubular also compared Ailong's proffered Russian import pricing to data from COMTRADE and GTA. Nucor Tubular's Rebuttal SV Submission at 4, Exhibit 3. As shown below, the COMTRADE and GTA data matched each other precisely as to both value and volume for the five months of the POR for which the COMTRADE and GTA data were available. The Datamyne data, however, differed significantly from these sources as to both the volume and value of Russian imports, without any obvious explanation.

| August 2019 – December 2019 Import Statistics For Russian Imports of Carbon Quality Steel Sheet Classified Under Russian HTS Subheading 7208.54 | | | |
|---|---|---|---|
| Source: | Datamyne | GTA | COMTRADE |
| Number of data points | 19 | 24 | 24 |
| Source Countries | China, Germany, Italy, Latvia, Not Declared, Poland, Russia, South Korea, Spain, Ukraine, United Kingdom | Belarus, China, Germany, Italy, Kazakhstan, Latvia, Poland, South Korea, Spain, Ukraine, United Kingdom | Belarus, China, Germany, Italy, Kazakhstan, Latvia, Poland, South Korea, Spain, Ukraine, United Kingdom |
| Declared Value (US$) | $2,882,685 | $4,398,223 | $4,398,223 |
| Quantity (MT) | 5,779.7185 | 9,482.480 | 9,482.480 |

Nucor Tubular's Rebuttal Brief at 9. Nucor Tubular also showed that the Datamyne data's unreliability extended to the tariff provision that Ailong suggested should be used to value its suppliers' steel scrap byproduct. *Id.* at 10-11. Ailong's Russian surrogate value data indicated that Russia's POR scrap price was nearly $3,000 per metric ton. But the record showed that of the 64 countries in the world that imported any meaningful volume of steel scrap in 2020, no country's scrap price exceeded $1,000 per metric ton. *Id.* at 10. For countries economically comparable to China and Russia, the price for scrap was approximately $225 per metric ton, or thirteen-times less than the Datamyne price for Russian scrap. *Id.*

Interested parties bear the burden of creating an adequate record. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (sustaining finding that certain surrogate value data were unreliable); *accord Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014). Ailong was entitled to place on the record surrogate value information from any source it wanted and from any country. *See* Commerce Request for SV Information; 19 C.F.R. § 351.301(c)(3). It could have submitted data to value hot-rolled plate from a reputable source,

such as GTA, and/or data from other countries, such as Malaysia. Instead, Ailong chose to submit apparently unreliable Russian data from an untested source without any accompanying documentation of the source's methods of data collection. Given the significant record evidence that Ailong's Russian surrogate value data were riddled with errors, Commerce had little choice but to reject those data. *See* I&D Memo at 5; *see also Longkou Haimeng Mach. Co. v. United States*, 33 CIT 603, 609-10, 617 F. Supp. 2d 1363, 1369-70 (2009) ("{I}f Commerce selects a particular set of data that is demonstrably unrepresentative or distortional a reasonable mind may rightly question how such a selection could be considered the 'best.'"); *T.T. Int'l Co. v. United States*, 439 F. Supp. 3d 1370, 1378 (Ct. Int'l Trade 2020) ("Where there is evidence that data is aberrational, Commerce must address that evidence in order to demonstrate that the data is nonetheless the best information available.").

As explained above, Ailong has failed to persuade that Commerce erred in determining normal value using a surrogate value the directly maps on to the actual input that Ailong used. But even if there was facial merit to Ailong's claim, it built a record that is bereft of reliable surrogate value data for valuing Ailong's suppliers' production inputs. Instead, Ailong put forward only demonstrably unreliable data. The Court should not reward Ailong for failing to build a record that would have enabled Commerce to use the surrogate valuation method that Ailong prefers. *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1387. Ailong made a strategic choice to submit demonstrably inaccurate hot-rolled data from an unverified source and from a single country, Russia.[4] *See* Nucor Tubular's Pre-Prelim. Comments at 12. Ailong must now live with this choice.

---

[4]      After Commerce completed the underlying review, the agency revoked Russia's market economy status. *See Emulsion Styrene-Butadiene Rubber From the Russian Federation*, 87 Fed. Reg. 69,002 (Dep't Commerce Nov. 17, 2022) (final affirm. deter. of sales at less than fair value and classification of the Russian Federation as a non-market economy).

Moreover, Ailong's arguments that Commerce erred in rejecting its unreliable Russian hot-rolled pricing fail to recognize that the agency prefers to value all FOP in a single country. *See, e.g.*, I&D Memo at 5 ("Commerce generally prefers to value all FOP{} within a single surrogate country . . . ."); Prelim. Decision Memo at 6 (noting that "Commerce will normally value FOPs using prices from a single country."); *see also* 19 C.F.R. § 351.408(c)(2). Here, Commerce selected Malaysia as the surrogate country. It did so not only because Malaysia provided reliable data for valuing Ailong's only direct material input (raw square tube), but because the Malaysian financial statements on the record were most relevant to the subject merchandise and Ailong's production. I&D Memo at 4, 7-8. Notably, Ailong has raised no challenge to Commerce's selection of surrogate financial statements. *See generally* Ailong's Brief.

## V.   **CONCLUSION**

For the reasons discussed above and in the Government's Brief, Nucor Tubular respectfully requests that this Court deny plaintiff's motion for judgment on the agency record.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Maureen E. Thorson, Esq.
Nicole C. Hager, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Nucor Tubular Products, Inc.*

Dated: December 16, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,743 words.

<u>/s/ Robert E. DeFrancesco, III</u>
(Signature of Attorney)

<u>Robert E. DeFrancesco, III</u>
(Name of Attorney)

<u>Nucor Tubular Products, Inc.</u>
(Representative Of)

<u>December 16, 2022</u>
(Date)