# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| HANGZHOU AILONG METAL PRODUCTS CO., LTD., | |
| *Plaintiff,* | |
| v. | |
| UNITED STATES, | Court No. 22-00116 |
| *Defendant,* | ***PUBLIC VERSION*** |
| and | |
| NUCOR TUBULAR PRODUCTS INC., | |
| *Defendant-Intervenor.* | |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Hangzhou Ailong Metal Products Co., Ltd.*

Dated:        January 13, 2023

# TABLE OF CONTENTS

**Page No.**

SUMMARY OF ARGUMENT ................................................................................1

ARGUMENT ......................................................................................................4

   I.     Commerce unlawfully used the raw square tube FOP .............................. 4

          A. Commerce must determine the appropriate raw material FOP before
              selecting the best SV for that FOP. ..........................................................4

          B. Commerce must use the FOP of the ultimate producer ...........................5

          C. Commerce does not normally value inputs that are subject merchandise.....9

          D. Commerce's selection of the raw square tube FOP was distortive............11

   II.    Commerce unlawfully used the SV for the final product ....................... 12

   III.   The Russian SV data for steel plate were reliable ............................... 18

   IV.   The Court should reject Defendant Intervenor's *post hoc* rationalization ............... 24

   V.    Ailong timely raised all issues .......................................................... 25

CONCLUSION ..................................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Baoding Mantong Fine Chemistry Co. v. United States*,
   279 F. Supp. 3d 1321 (Ct. Int'l Trade 2017) ........................................................24

*Chevron U.S.A. v. Natural Res. Def. Council*,
   467 U.S. 837 (1984)...............................................................................................14

*Clearon Corp. v. United States*,
   37 CIT 220 (2013) .................................................................................................24

*IBP, Inc. v. Alvarez*,
   546 U.S. 21 (2005)...................................................................................................9

*Info. Tech. & Applications Corp. v. United States*,
   316 F.3d 1312 (Fed. Cir. 2003)........................................................................13, 14

*Kinetic Indus., Inc. v. United States*,
   800 F. Supp. 2d 1339 (Ct. Int'l Trade 2011) ..........................................................8

*Lasko Metal Prods., Inc. v. United States*,
   810 F. Supp. 314 (Ct. Int'l Trade 1992) ...............................................................23

*Motor Vehicle Mfrs. Ass'n. v. State Farm*,
   463 U.S. 29 (1983)...............................................................................................3, 25

*Rhone Poulenc, Inc. v. United States*,
   899 F.2d 1185 (Fed. Cir. 1990)..............................................................................23

*SFK USA, Inc. v. United States*,
   630 F.3d 1365 (Fed. Cir. 2011)................................................................................8

*United States National Bank v. Independent Insurance Agents of America, Inc.*,
   508 U.S. 439 (1993)................................................................................................14

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
   *716 F.3d 1370 (Fed. Cir. 2013)* ............................................................................12

*Zhaoqing Tifo New Fibre Co. v. United States*,
   168, 355 F. Supp. 3d 1285 (Ct. Int'l Trade 2018) .................................................12

*Zhengzhou Harmoni Spice Co. v. United States*,
   617 F. Supp. 2d 1281 (Ct. Int'l Trade 2009) ......................................12, 15, 16, 17

ii

**Statutes**

19 U.S.C. § 1677b(c) ................................................................................................24, 25

19 U.S.C. § 1677b(c)(1) ................................................................................................ *passim*

19 U.S.C. § 1677b(c)(1)(B) ................................................................................................14

19 U.S.C. § 1677b(c)(2) ................................................................................................ *passim*

**Other Authorities**

19 C.F.R. § 351.408(c)(2) ................................................................................................23

68 Fed. Reg. 10,685 (Mar. 6, 2003) ................................................................................10

68 Fed. Reg. 47,538 (Aug. 11, 2003) ..............................................................................10

70 Fed. Reg. 28,274 (May 17, 2005) ...............................................................................10

82 Fed. Reg. 29,033 (June 27, 2017) ...............................................................................10

83 Fed. Reg. 53,214 (October 22, 2018) ....................................................................6, 7, 8

84 Fed. Reg. 14,650 (April 11, 2019) ..............................................................................18

84 Fed. Reg. 36,886 (July 30, 2019) ..........................................................................19, 20

85 Fed. Reg. 67,511 (October 23, 2020) .........................................................................21

69 Fed. Reg. 6,255 (February 10, 2004) ........................................................................8, 9

81 Fed. Reg. 42,314 (June 29, 2016) ..........................................................................18, 21

84 Fed. Reg. 25,738 (June 4, 2019) .................................................................................18

Plaintiff Hangzhou Ailong Metal Products Co., Ltd., ("Ailong") hereby submits this reply brief in support of Rule 56.2 motion for judgement on the agency record contesting Commerce's decision to use Ailong's raw square tube factor of production ("FOP") together with the Malaysian surrogate value ("SV") for steel tube in the 2019-2020 administrative review of the antidumping duty order on light-walled rectangular pipe and tube from China.

## SUMMARY OF ARGUMENT

In the underlying review, Commerce unlawfully used the raw square tube FOP.  Application of the FOP valuation methodology under 19 U.S.C. § 1677b(c)(1) is a two-step process.  Commerce must *first* select the appropriate factors of production and *then* select the best available information regarding the values of the selected factors of production.  Commerce did not follow this process.  Instead, Commerce *first* determined the "best information" (i.e., the Malaysian SV for steel tube) based on the alleged data quality and *then* selected the corresponding FOP (i.e., raw square tube).

Ailong's supplier used steel plate to manufacture the subject merchandise. Ailong purchased, further processed, and exported the subject merchandise.  In prior cases, Commerce determined that further processing does not make the processor the ultimate producer of the subject merchandise.  Commerce also

1

determined that production of the subject merchandise requires transformation from out-of-scope merchandise to in-scope merchandise.  Therefore, in this case, the appropriate raw material input FOP is steel plate utilized by Ailong's supplier.

Furthermore, Commerce misapplied the FOP valuation method under § 1677b(c)(1) by using the surrogate value for the final product (i.e., the Malaysian SV for steel tube).  The Malaysian surrogate value represents the market value of the subject merchandise and the final product (as opposed to any FOP utilized in producing such final product).  The FOP valuation methodology under 19 U.S.C. § 1677b(c)(1) does not permit Commerce to value a factor of production based on the value of the final product.  Therefore, Commerce's use of the Malaysian surrogate value was unlawful.

Contrary to Defendant's claims, the Russian SV data for steel plate were reliable and the best available information regarding the value of the raw material input for the subject merchandise.  The record demonstrates that the data were obtained from a reliable source and provided a reasonable surrogate value for steel plate utilized by Ailong's suppliers.  Ailong also placed on the record the Russian surrogate data for all other inputs.  Therefore, Commerce could value all factors of production based on the Russian SV data.

Defendant-Intervenor claims that Commerce rejected the Russian SV data because they were aberrational.  Commerce did not base its rejection of the Russian SV data on a finding that the data were aberrational.  Instead, Commerce based its decision regarding the reliability on the coverage of the data.  Defendant also did not argue the Russian SV data were aberrational.  An agency's action must be upheld "on the basis articulated by the agency itself."[1]  Therefore, the Court should reject Defendant-Intervenor's *post hoc* rationalization.

Finally, Defendant argues that Ailong failed to raise that Commerce can only use the SV for the subject merchandise itself under the alternative method in § 1677b(c)(2).  This is a misstatement because Ailong argued during the underlying proceeding that Commerce should not value subject merchandise directly under § 1677b(c)(1).  This argument entails that Commerce must use a different method (i.e., alternative method) to value subject merchandise directly.  Moreover, in the Final Results, Commerce <u>for the first time</u> determined that the Russian surrogate value is unreliable and implied that no surrogate value was available for the steel plate FOP.  As such, Ailong timely raised the argument that Commerce can only value the subject merchandise directly under the alternative method.

---

[1] *See Motor Vehicle Mfrs. Ass'n. v. State Farm*, 463 U.S. 29, 50 (1983).

## ARGUMENT

**I.   Commerce unlawfully used the raw square tube FOP**

**A. Commerce must determine the appropriate raw material FOP before selecting the best SV for that FOP.**

In calculating the normal value of the subject merchandise, Commerce relied on the factor of production ("FOP) valuation methodology under 19 U.S.C. § 1677b(c)(1).  *See* Def. Br. at 9.  This provision describes a two-step process:

> Step 1. Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise {…}."

> Step 2. "{T}he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries {…}."

Therefore, to apply the FOP valuation methodology, Commerce must select the appropriate factors of production and **then** select the best available information regarding the values of the *selected* factors of production.

In the underlying investigation, Commerce applied the two-step process **backward**.  Commerce *first* determined that the best available information for Ailong's raw material input was the Malaysian surrogate value for steel tube –

4

primarily based on its review of the data quality.  *See Final IDM* (PR 124), at 5.

Commerce *then* determined that the applicable FOP was raw square tube because

the selected "best available information" was for steel tube.  *See id.*  In other

words, Commerce selected the best information without even determining what

that information should be best for.  This was unlawful.

The statute requires Commerce to select the appropriate raw material FOP

and then determine the best available surrogate value for *that* FOP.  *See* 19 U.S.C.

§ 1677b(c)(1)("the best available information **regarding the values of <u>such</u>**

**factors**) (emphasis added).  Therefore, Commerce should have determined whether

the appropriate raw material FOP is square raw tube or steel plate *before*

determining the best surrogate value for the selected FOP.  The record clearly

demonstrates that the appropriate FOP was steel plate utilized by Ailong's supplier

who was the ultimate producer of the subject merchandise.

### B. Commerce must use the FOP of the ultimate producer

In the underlying review, steel plate was the appropriate FOP because it was

the actual raw material input utilized by Ailong's supplier in producing the subject

merchandise.  Ailong purchased, further processed, and exported the subject

merchandise.  However, the ultimate producer of the subject merchandise was

Ailong's supplier, not Ailong.  Therefore, the appropriate raw material FOP was the steel plate utilized by Ailong's supplier.

In its case brief, Plaintiff explained that Commerce has consistently determined that the appropriate FOP is the raw material input utilized by the ultimate producer.  For example, in *Activated Carbon from China*, Commerce applied adverse facts available ("AFA") to a respondent because it failed to provide the FOPs from the "ultimate producer."[2]  This case involved three companies in the chain of sale:

Supplier to Supplier X    →    Supplier X    →    Exporter
(Production)                        (Further Processing)        (Respondent)

The respondent was the exporter of the subject merchandise.  The respondent purchased activated carbon from supplier X.  Supplier X purchased activated carbon from its supplier and further processed the purchased activated carbon before selling it to the respondent.  Supplier's X's supplier produced the unprocessed activated carbon which was already the subject merchandise.  *See id.*  Commerce applied AFA because the respondent provided the FOPs of supplier X, instead of the FOPs of supplier X's supplier.  In making this decision, Commerce

---

[2] Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017, 83 Fed. Reg. 53,214 (October 22, 2018) ("*Activated Carbon from China*") and accompanying Issues and Decision Memorandum (October 16, 2018), at Comment 1.

noted that supplier X purchased and **further processed** active carbon which "would have been subject merchandise when exported to the United States."[3] Therefore, Commerce determined that supplier X was not the ultimate producer and rejected supplier X's factors of production.

*Activated Carbon from China* stands for the position that the ultimate producer is the producer of the subject merchandise even if that merchandise has been further processed by another entity before being exported to the United States. In its brief, Defendant attempts to distinguish *Activated Carbon* form this case by stating that "the supplier shipped goods directly purchased from the ultimate producer of subject merchandise without any further processing—i.e., the supplier was only an exporter." Def. Br. at 13. This is an incorrect summary of the facts in *Activated Carbon*. The respondent in that case did not ship goods directly purchased from the ultimate producer of subject merchandise. The respondent purchased from supplier X. Supplier X purchased and further processed activated carbon sourced from the ultimate producer.[4] Therefore, *Activated Carbon* confirms that further processing does not make the processor the ultimate producer of the subject merchandise.

---

[3] *Id.*
[4] *See Activated Carbon from China* IDM, at 5-7.

*In Activated Carbon*, Commerce rejected supplier X's factors of production because supplier X purchased and further processed active carbon that was already subject merchandise.[5]  In this case, Ailong purchased and further processed raw square tube that was already subject merchandise.  Therefore, Commerce should also determine that the ultimate producer is Ailong's supplier and the appropriate FOP is steel plate utilized by the supplier.  "{W}hile courts must grant deference to Commerce's reasonable statutory interpretations, once Commerce has adopted a policy it must apply it consistently." *Kinetic Indus., Inc. v. United States*, 800 F. Supp. 2d 1339, 1344 (Ct. Int'l Trade 2011) (citing *SFK USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011)).

Commerce's decision in *Activated Carbon* regarding "ultimate producer" is consistent with its decisions regarding the producer status in investigations involving market-economy countries.  In *Pasta from Italy*[6], Commerce determined that the term "production" in "cost of production requires "transformation of the merchandise outside the scope of the order to merchandise within the scope of the order:"

---

[5] *See id.*
[6] Certain Pasta Final Results of the Sixth Administrative Review of the Antidumping Duty Order and Determination Not to Revoke in Part, 69 Fed. Reg. 6,255 (February 10, 2004) ("*Pasta from Italy*") and accompanying Issues and Decision Memorandum (February 10, 2004), at Comment 42.

The law specifies that the production costs of the subject merchandise, not the acquisition costs of the merchandise, be used in the antidumping duty calculation. 'Cost of production,' as used in section 773(b)(1) of the Act, means the cost to produce such merchandise, not the cost of purchasing such merchandise. In the Department's findings in <u>Fresh and Chilled Atlantic Salmon from Norway, Final Results of Antidumping Duty Administrative Review</u>, 61 FR 65522, 65523 (December 13,1996) and accompanying Issues and Decision Memorandum, at Comment 1, the Department stated that when there is no **transformation of the merchandise outside the scope of the order to merchandise within the scope of the order**, the Department must obtain the respondent's costs of production as well as the producer's cost of production. <u>See also Notice of Preliminary Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes from Canada</u>, 66 FR 51010 (October 5,2001) and <u>Notice of Preliminary Determination of Sales at Less Than Fair Value: Honey from Argentina</u>, 66 FR 24108, 24112 (May 11, 2001).[7]

"Under the normal rule of statutory interpretation, identical words used in different parts of the same statute are generally presumed to have the same meaning {…}. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 22 (2005). Therefore, Commerce should also determine that the term "production" in "factors of production" requires transformation from out-of-scope merchandise to in-scope merchandise.

### C. Commerce does not normally value inputs that are subject merchandise

Defendant-Intervenor argues that Commerce's use of the steel tube FOP was "consistent with its 'normal practice {of} valu{ing} purchased components and not

---

[7] *Id. (emphasis added).*

the input factors used to produce them if the firm is not integrated.'"  DI Br. at 9.

This statement is misleading.  Commerce's practice of directly valuing purchased

inputs is generally limited to inputs that are not subject merchandise.

In its response brief, Defendant-Intervenor cites four cases to support its

position that Commerce normally values a purchased input directly: *Crystalline*

*Silicon Photovoltaic Cells from China*[8], *Polyvinyl Alcohol from China*[9], *Helical*

*Spring Lock Washers*[10], *Ball Bearings and Parts Thereof from China.*[11]  *See* DI Br.

at 9 & 10.  All of those cases except for one involved an input that is not the

subject merchandise.  The only exception was *Ball Bearings and Parts Thereof*

*from China.*  Even in that case, Commerce used the upstream factors of production

to value purchased components:

> In this case bearing parts can vary considerably in value {…}.
> There are only two average surrogate values available for all
> these parts–one for balls and one for all other components. If we
> were to use the one average value for all other components to
> value all components other than balls, we would fail to account
> for this significant variation in value among these various

---

[8] Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, From the People's Republic of China, 82 Fed. Reg. 29,033 (June 27, 2017) ("*Crystalline Silicon Photovoltaic Cells from China*"), and accompanying Issues and Decision Memorandum.
[9] Polyvinyl Alcohol from the People's Republic of China, 68 Fed. Reg. 47,538 (Aug. 11, 2003) ("*Polyvinyl Alcohol from China*"), and accompanying Issues and Decision Memorandum.
[10] Certain Helical Spring Lock Washers from the People's Republic of China, 70 Fed. Reg. 28,274 (May 17, 2005) ("*Helical Spring Lock Washers*"), and accompanying Issues and Decision Memorandum.
[11] Certain Ball Bearings and Parts Thereof From the People's Republic of China, 68 Fed. Reg. 10,685 (Mar. 6, 2003) "*Ball Bearings and Parts Thereof from China*"), and accompanying Issues and Decision Memorandum (February 27, 2003).

components. By using the FOPs used to produce these components we can better account for this variation in value. {…}. With respect to balls, even though the record contains an average surrogate value for balls, we have some concern that this value too may encompass a broad range of products and values. Given this concern and in light of our use of upstream FOPs for purchased components in previous bearings cases, we have decided to use the upstream FOPs for purchased balls for purposes of this final determination.

*Ball Bearings and Parts Thereof from China* IDM, at 38 & 39.  More importantly, the ball bearing case is distinguishable from the current case because it covers both bearings and ***parts of bearings***.  As noted by Commerce, "{b}earing producers ***typically*** make many but not all of these parts." *Id.* (emphasis added).  Therefore, Commerce's practice in bearing cases "has been, to some extent, based on the unique nature of bearing production." *Id.*

### D. Commerce's selection of the raw square tube FOP was distortive

Defendant argues that Commerce's use of the raw square tube FOP was reasonable because Ailong added significant value to the raw square tube by performing further processing.  *See* Def. Br. at 6, 13 & 18.  Defendant-Intervenor cites to Ailong's statement that the export price of the subject merchandise was "more than [          ] of the purchase price of the {raw square tubes}."  *See* DI Br. at 2.  However, this point exactly demonstrates why Commerce should not have used the raw square tube FOP.  As explained previously, the Malaysian SV for steel tube represents the market price of the subject merchandise.  *See* Pl. Br. at 15-

18.  Therefore, when used together with the raw square tube FOP, the Malaysian

surrogate value inflates Ailong's raw material costs by more than [        ].

Commerce's use of the steel tube FOP together with the Malaysian SV for

steel tube resulted in impermissible double counting.  As noted by Defendant-

Intervenor, even "Commerce duly recognized the potential for double-counting

inherent in this data's use."  DI Br. at 11.  The court recognized the potential for

double counting when valuing an intermediate product based on the surrogate

value for the final product.  *See e.g. Zhengzhou Harmoni Spice Co. v. United*

*States*, 617 F. Supp. 2d 1281, 1300 (Ct. Int'l Trade 2009).  "{A}s a general rule,

double counting is not permitted in antidumping calculations, because it is

distortive, rendering dumping margins less accurate."  *See, e.g., Zhaoqing Tifo*

*New Fibre Co. v. United States*, 168, 355 F. Supp. 3d 1285 (Ct. Int'l Trade 2018).

"An overriding purpose of Commerce's administration of antidumping laws is to

calculate dumping margins as accurately as possible."  *Yangzhou Bestpak Gifts &*

*Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013).*

## II.  Commerce unlawfully used the SV for the final product

In calculating the normal value of the subject merchandise, Commerce relied

on the FOP valuation methodology under 19 U.S.C. § 1677b(c)(1). *See* Def. Br. at

9.  In that calculation, Commerce used the market price of the final product (i.e.,

the Malaysian import data for the subject merchandise) as the surrogate value for a

raw material utilized in producing the final product.  *See* Pl. Br. at 15-18.  This was

unlawful.

The FOP valuation methodology under 19 U.S.C. § 1677b(c)(1) does not

permit Commerce to value a factor of production based on the value of the final

product.  As Defendant-Intervenor noted in its response brief, the term "factor of

production" is not defined in the statute.  *See* DI Br. at 10.  When a term in not

defined in the statute, the court may assume that it has its "ordinary, established

meaning" and consult dictionaries.  *See Info. Tech. & Applications Corp. v. United

States,* 316 F.3d 1312, 1320 (Fed. Cir. 2003).  Merriam-Webster Unabridged

Dictionary defines "factor of production" as "a good or service (as land, labor, or

capital) used in the process of production."[12]  Moreover, the statute clearly

describes the term in the phrase "the factors of production utilized in producing the

merchandise."  The statute even provides examples of the factors of production:

> (3)    Factors of production
>
> For purposes of paragraph (1), the factors of production utilized in
> producing merchandise include, but are not limited to—
>
> > (A)    hours of labor required,
> > (B)    quantities of raw materials employed,
> > (C)    amounts of energy and other utilities consumed, and

---

[12] Merriam-Webster Unabridged Dictionary, December 30, 2022, https://unabridged.merriam-webster.com/unabridged/factor

(D)    representative capital cost, including depreciation.

19 U.S.C. § 1677b(c)(1).  "If the statutory language is plain and unambiguous, then

it controls … and we may not look to the agency regulation for further

guidance." *Info. Tech. & Applications Corp. v. U.S.* (citing *Chevron U.S.A. v.*

*Natural Res. Def. Council,* 467 U.S. 837, 842-43 (1984)).   Based on the statutory

language, there is no ambiguity that a factor of production is different from the

final product.  It exists prior to production of the final product and is "utilized" in

the production process.

The statute further provides that "the valuation of the factors of production

shall be based on the best available information regarding <u>the values of such</u>

<u>factors</u> in a market economy country or countries …."  19 U.S.C. § 1677b(c)(1)(B)

(emphasis added).  As explained above, a factor of production cannot be the final

product.  Therefore, Commerce must value a factor of production based on

information regarding the <u>value of such factor of production</u>, not the value of the

final product.

The structure of the statute also supports that 19 U.S.C. § 1677b(c)(1) does

not permit Commerce to value a FOP based on the value of the final product.  The

meaning of statutory language is determined by "the provisions of the whole

law."  *United States National Bank v. Independent Insurance Agents of America,*

*Inc.,* 508 U.S. 439, 455 (1993). As explained previously, the statute provides two methods for calculating normal value: (1) default method under § 1677b(c)(1); and (2) alternative method under § 1677b(c)(2). The alternative method provides that, when available information does not permit the use of the default FOP valuation method, Commerce shall determine the normal value based on the market price of merchandise comparable to the subject merchandise. In other words, the use of the surrogate value for the final product is specifically provided in § 1677b(c)(2) as an alternative to the default method. Therefore, under the default method described in § 1677b(c)(1), Commerce may not use the surrogate value for the final product.

The court has examined this issue in a prior case. *See Zhengzhou Harmoni Spice Co. v. United States*, 617 F. Supp. 2d 1281 (Ct. Int'l Trade 2009). This case involved the tenth administrative review of the antidumping duty order covering fresh garlic from China. During the review, Commerce conducted onsite "harvest verifications" to address certain concerns expressed in prior reviews as to the reliability of respondents' reported factors of production. Commerce then determined that the record maintained by the Chinese garlic producers do not allow them to identify all of the factors of production necessary to grow and harvest garlic. Accordingly, Commerce decided to value the intermediate input, raw garlic bulb (in lieu of the upstream factors of production used to produce that input) in calculating the normal value. This "intermediate input method" was used within

the framework of the default FOP valuation methodology under 1677b(c)(1). *See id.* at 1286-1289.

In *Zhengzhou v. U.S.*, the Chinese garlic producers challenged Commerce's decisions and claimed that the intermediate input at issue (i.e., raw garlic bulb) is "the actual product subject to the dumping order." *See id.* at 1283. The court ruled against this argument noting that the subject merchandise "is not the raw bulb, but – rather – fresh garlic, which {…} obviously requires at least some degree of processing in order to be ready for shipment." *See id.* at 1294. However, the court still addressed the possibility that the surrogate value for the raw garlic bulb may include the market price of the subject merchandise:

> … Commerce should consider this possible inconsistency and the potential for double counting that may result when using data from the Agmarknet database, which presumably contains information regarding Indian market transactions and is representative of the *final* garlic product rather than an *intermediate* garlic product (i.e., garlic bulb). *See* Pls.'Brief at 12-14.
>
> As the Chinese Producers emphasized at oral argument, Commerce's use of Agmarknet data for the intermediate input appears to conflict with its prior claim that raw garlic - the intermediate input - is not the subject merchandise because it requires further processing to become market-ready fresh garlic (the final product). *See* Recording of Oral Argument at 1:50:00. … {O}n remand, Commerce should be mindful that, when valuing an intermediate product in an NME country case, **it must find a surrogate representative of that intermediate product.** *See* Decision Memorandum at 52-53; *see also* Def.'s

> Brief at 29-30. Here, it is unclear whether Agmarknet's Indian
> garlic is adequately representative of the respondents'
> "intermediate" garlic bulb.

*Id.* at 1300 (footnote omitted; emphasis added).  Therefore, the court has clearly

ruled that a surrogate value for the final product cannot used as the surrogate value

for an intermediate product used in producing the final product.  Likewise, a

surrogate value for the subject merchandise cannot be used as the surrogate value

for a factor of production utilized in producing the subject merchandise.

As the court in *Zhengzhou* properly noted, a surrogate value for the final

product is ***not representative*** of the value of any factor of production utilized in

producing the final product.  In other words, the surrogate value for the final

product does not even qualify as "information regarding the values of such

factors."  The surrogate value for the final product is categorically different from

the information described in § 1677b(c)(1) and cannot be used as the "best

available information" for the purposes of applying the default methodology under

that provision.  Therefore, Commerce' use of the Malaysian surrogate value for

steel tube was impermissible under § 1677b(c)(1).

"Courts have recognized Commerce's discretion in weighing between two

imperfect options in selecting the best available information."  Def. Br. at 17.

However, in the underlying review, the use of Malaysia surrogate value ("SV") for steel tube was an impermissible option, not an imperfect one.

### III.  The Russian SV data for steel plate were reliable

In its response brief, Defendant claims that Commerce used the Malaysian surrogate value for steel tube as the best available information because the Russian SV data for steel plate were unreliable.  Def. Br. 15.  This is unsupported by substantial evidence.

In the underlying review, Plaintiff submitted surrogate value data for prices of steel plate imports into Russia based on the Datamyne database.  *See generally Ailong's Second SV Submission* (August 2, 2021) (PR 63-69).  Datamyne is a reliable source of data for surrogate values.  As noted by Commerce in prior cases, Datamyne is a publicly available[13] subscription database that gathers "international trade data from authorized government sources"[14] and is "based on actual pricing."[15]  While Commerce "generally prefers" data from Global Trade Atlas

---

[13] *See* Circular Welded Carbon Quality Steel Pipe From the People's Republic of China: Rescission of Countervailing Duty Administrative Review; 2017, 84 Fed. Reg. 14,650 (April 11, 2019).

[14] *See* Hydrofluorocarbon Blends and Components Thereof Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 81 Fed. Reg. 42,314 (June 29, 2016) and accompanying Issues and Decision Memorandum, at footnote 451.

[15] *See* Refillable Stainless Steel Kegs Preliminary Affirmative Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 25,738 (June 4, 2019) and accompanying Issues and Decision Memorandum, at 9.

("GTA"), Commerce is also familiar with Datamyne.  Commerce has accepted and analyzed import data obtained from Datamyne for surrogate values in previous antidumping proceedings.  *See, e.g.* Crystalline Silicon Photovoltaic Cells Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017, 84 Fed. Reg. 36,886 (July 30, 2019) and accompanying Issues and Decision Memorandum.  Therefore, regardless of Commerce's preference for GTA, Datamyne is also a reliable source of SV data.

In the Final Results, Commerce questioned the reliability of the Russian SV data for steel plate provided by Ailong.  However, the only explanation provided by Commerce was as follows.

> Specifically, import statistics from the record show significant variance between Datamyne data on one hand and GTA – as well as UN COMTRADE – for steel plate on the other. For instance, GTA and UN COMTRADE match each other precisely regarding declared value and quantity of steel plate, while Datamyne reflects a much lower value for HTS code 7208.54.

Final IDM (PR 124), at 5 (footnotes omitted).  This observation was based on the following table provided by Petitioners:

| Assessment of August 2019 – December 2019 import statistics for Russian imports of carbon quality steel sheet classified under Russian HTS subheading 7208.54 | | | |
|---|---|---|---|
| Source: | Datamyne | Global Trade Atlas | UN COMTRADE |
| Number of data points | 19 | 24 | 24 |
| Source Countries | 11: China, Germany, Italy, Latvia, Not Declared, Poland, Russia, South Korea, Spain, Ukraine, United Kingdom | 11: Belarus, China, Germany, Italy, Kazakhstan, Latvia, Poland, South Korea, Spain, Ukraine, United Kingdom | 11: Belarus, China, Germany, Italy, Kazakhstan, Latvia, Poland, South Korea, Spain, Ukraine, United Kingdom |
| Declared Value (US$) | $2,882,685 | $4,398,223 | $4,398,223 |
| Quantity (MT) | 5,779.7185 | 9,482.480 | 9,482.480 |

*See id.* at fn *18 & 19; see* Petitioner's Rebuttal SV Brief (October 25, 2021) (PR

117; CR 51), at 9.  However, this table does not demonstrate that Datamyne is

unreliable.  **<u>Rather, it demonstrates that Datamyne is reliable</u>**.  The table shows

that, while Datamyne does not cover all imports of steel plate, it covers more than

60%[16] of such imports.  The fact that Datamyne covers a significant portion of the

entire universe for prices of steel plate imports into Russia **supports** – not

undermines – the reliability of Datamyne.

There is no requirement that a surrogate value must be based on the prices of

imports from all countries.  Moreover, the only difference between Datamyne and

the other two sources is that the other sources include data for imports from

Belarus and Kazakhstan.  The data for all other countries are substantially the same

because Datamyne gathers "international trade data from authorized government

---

[16] 5,779.7185 MT / 9,482.480 MT = 61%.

sources."[17]  Also, Commerce would have excluded data for imports from Belarus

because it is an NME country. [18] Commerce excludes from its "SV calculations any

data for imports from NME countries {…} and imports from countries that

Commerce has determined maintain non-specific export subsidies." *See Prelim SV*

*Memo* (PR 106), at 2.

Furthermore, the above chart indicates that, even including the NME and

subsidy countries, the average per-unit values of steel plate reported in the three

databases (i.e., the relevant data point) are similar and comparable:

| Source | Datamyne | GTA | UN COMTRADE |
|---|---|---|---|
| Declared Value (USD) | $2,882,685 | $4,398,223 | $4,398,223 |
| Quantity (MT) | 5,779.72 | 9,482.48 | 9,482.48 |
| AUV (USD/MT) | $498.76 | $463.83 | $463.83 |

In fact, the value of steel plate is the highest in the Datamyne data.  Similarly, the

average price for the Russian SV data for steel plate provided by Ailong was

**$500.77 per MT** after excluding imports from non-market economy countries and

subsidy countries:

---

[17] *See* Hydrofluorocarbon Blends and Components Thereof Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 81 Fed. Reg. 42,314 (June 29, 2016) and accompanying Issues and Decision Memorandum, at footnote 451.
[18] *See* Steel Concrete Reinforcing Bars From Belarus and Carbon and Alloy Steel Wire Rod From Belarus: Final Results of Antidumping Duty Changed Circumstances Reviews, 85 Fed. Reg. 67,511 (October 23, 2020).

| Description | Quantity | Value | Average[19] |
|---|---|---|---|
| 720854 - FLAT-ROLLED IRON OR NONALLOY STEEL, 600 MM OR MORE WIDE, HOT-ROLLED, NOT CLAD, PLATED, COATED OR COILS, LESS THAN 3 MM THICK | 16,704 MT | $8,365,033 | $500.77 |

*See Ailong's Second SV Submission* (PR 63-69), at Exhibit SV-13 (PR 63; pdf. pg. 50).

Even if *arguendo* the Russian import data from Datamyne were unreliable, Commerce had access to other sources of information for the surrogate value for the steel plate FOP. For example, Commerce could use the average price of steel plate based on GTA and UN COMTRADE submitted by Petitioners – i.e., $463.83 per MT. *See supra*. Commerce could also use the pricing data from the international publication Steel Business Briefing ("SBB") submitted by Petitioner. *See* Nucor Tubular's Rebuttal SV Filing (August 12, 2021) (PR 83), at Exhibit 1. SBB indicated that the average domestic price of hot-rolled sheet was approximately $430/MT in Russia, $461/MT in Turkey, $549/MT in Brazil, and $449.00/MT in southeast Asia. *See id.* Commerce could use this information to determine the "best available information" regarding the value of the steel plate input utilized in producing the subject merchandise. Commerce's discretion to

---

[19] 8,365,033.08 / 16,704.2458 = 500.77

select the best available information must be aimed at calculating "the closest

approximation of the cost of producing the goods in a market economy country."

*See Lasko Metal Prods., Inc. v. United States*, 810 F. Supp. 314, 316–17 (Ct. Int'l

Trade 1992).  As shown above, by selecting the Malaysian surrogate value for steel

tube, Commerce grossly inflated Ailong's cost of production and failed to meet the

primary goal of the antidumping statute to calculate dumping margins "as

accurately as possible."  *See Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185,

1191 (Fed. Cir. 1990).

In its brief, Defendant argues that Commerce's selection of the Malaysian

surrogate value was reasonable because the Russian SV data were unreliable and

Commerce has the preference for valuing all factors of production within a single

surrogate country.  *See* Def. Br. at 6, 10 & 18.  However, as explained above, the

Russian SV data were reliable.  Also, Ailong placed on the record the Russian SV

data for all other inputs.[20]  Therefore, Commerce could value all factors of

production based on the Russian SV data.

Moreover, Commerce was not required to value all factors of production

within a single surrogate country.[21]  As noted by Defendant, Commerce's

---

[20] *See generally Ailong's Second SV Submission* (PR 63-69).
[21] Commerce's regulations provide that "{e}xcept for labor, . . . the Secretary normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2).  The word "normally" indicates that Commerce retained the discretion to use data from more than one surrogate

preference for a single surrogate country is intended to "limit{} the amount of distortion introduced into its calculations." *See* Def. Br. at 18 (citing *Clearon Corp. v. United States*, 37 CIT 220, 228-29 (2013)).  As demonstrated above, the Malaysian surrogate value for steel tube resulted in a serious distortion because it was not representative of any input utilized in producing the subject merchandise. Therefore, to limit distortion in its margin calculation, Commerce should have selected the Russian SV for steel plate as the best available information regarding the value of the raw material input utilized in producing the subject merchandise.

## IV.  The Court should reject Defendant Intervenor's *post hoc* rationalization

In its brief, Defendant-Intervenor claims that the Datamyne data were unreliable because the Russian steel plate price sourced from Datamyne was aberrational.  *See* DI Br. at 13.  Commerce did not itself base its rejection of the Russian SV data on a finding that the data were aberrational.  Instead, it based its decision regarding the reliability on the coverage of the Russian data.  Specifically,

---

countries.  The statute also contemplates situations in which Commerce may need to rely upon data from more than one surrogate country.  *See* 19 U.S.C. § 1677b(c) ("the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or <u>countries</u> considered to be appropriate by the administering authority.") (emphasis added).  "While the regulation expresses a preference for using information from only one surrogate country {…}, the regulation cannot be read so broadly as to defeat the congressional directive that factors of production be valued according to the best available information."  *Baoding Mantong Fine Chemistry Co. v. United States,* 279 F. Supp. 3d 1321, 1326 (Ct. Int'l Trade 2017).  "By using those words, the provision allows for instances in which data in the country Commerce otherwise might choose as its single surrogate country poses a significant problem for a particular factor of production."  *Id.*

Commerce noted that, while GTA and UN COMTRADE cover $4,398,223 of steel plate imports, Datamyne only covers $2,882,685. *See* Final IDM (PR 124), at 5 ("For instance, GTA and UN COMTRADE match each other precisely regarding declared value and quantity of steel plate, while Datamyne reflects a much lower value for HTS code 7208.54."). Furthermore, Defendant did not argue that the Russian SV data were aberrational. *See generally* Def. Br. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n. v. State Farm*, 463 U.S. 29, 50 (1983). Therefore, the Court should reject Defendant-Intervenor's *post hoc* rationalization of Commerce's decision regarding the reliability of the Russian SV data.

## V.   Ailong timely raised all issues

In its response brief, Defendant argues that Ailong failed to exhaust its administrative remedies with respect to Commerce's selection of the valuation method under 19 U.S.C. § 1677b(c). *See* Def. Br. 19-22. Defendant argues that "Ailong asserts, for the first time, that Commerce would only be permitted use the surrogate value for the subject merchandise itself under the price of comparable merchandise method under 19 U.S.C. § 1677b(c)(2) (*i.e.,* alternative method)." *Id.* at 13. This is an incorrect statement.

In its administrative case brief, Ailong made an extensive argument that Commerce should not value subject merchandise directly under § 1677b(c)(1) (*i.e.,* default method.)  *See e.g.,* Ailong's Case Brief (PR 114; CR 50), at 7. ("Valuing subject merchandise directly and adding further processing FOPs would result in double counting.").  Ailong argued that Commerce should not use the Malaysian SV for steel tube because it "encompasses the value of the finished square tubes." *Id.*  In other words, Ailong made it clear that the FOP methodology does not permit Commerce to use the value of finished product (i.e., the Malaysian surrogate value).  This argument entails that the only way for Commerce to use the Malaysian surrogate value for steel tube is to resort to a methodology other than the default methodology (i.e., alternative methodology).  Therefore, Defendant incorrectly asserts that Ailong failed to timely raise the issue.

Moreover, in the Preliminary Results, the margin program incorrectly indicated that Commerce used the steel plate FOP with the Malaysian surrogate value for steel tube.  *See id.* at 2-5.  Also, Commerce has not yet determined that the Russian surrogate value for steel plate is unreliable.  *See generally Prelim SV Memo* (PR 106).  Therefore, at the time, the contentious issue was the mismatch between the FOP and the surrogate value.  However, in the Final Results, Commerce <u>for the first time</u> determined that the Russian surrogate value is unreliable and implied that no surrogate value was available for the steel plate

26

FOP.  In such circumstances, the statute directs Commerce to use the alternative method.  *See* §19 U.S.C. § 1677b(c)(2) (Commerce may use the alternative method if "the available information is inadequate for purposes of determining the normal value" based on factors of production).  Therefore, Ailong timely raised the argument that Commerce should have used the Malaysian surrogate value only under the alternative methodology in § 1677b(c)(2).

## **CONCLUSION**

For the reason discussed in this brief, Plaintiff respectfully urge this Court to reject the arguments of Defendant and Defendant-Intervenors in their response briefs.

Respectfully submitted,

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Hangzhou Ailong Metal Products Co., Ltd.*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 5,994 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

Daniel Cannistra