Slip Op. 23-50

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HANGZHOU AILONG METAL PRODUCTS CO., LTD., <br><br>   Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br>   Defendant, <br><br> and <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br>   Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge <br> Court No. 22-00116 |

## OPINION

[Sustaining Commerce's final results in the 2019–2020 administrative review of the antidumping duty order on light-walled rectangular pipe and tube from the People's Republic of China.]

Dated: April 11, 2023

Daniel J. Cannistra and Pierce J. Lee, Crowell & Moring LLP, of Washington, DC, for Plaintiff Hangzhou Ailong Metal Products Co., Ltd.

Kristin E. Olson, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director.  Of counsel on the brief was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Alan H. Price, Robert E. DeFrancesco, III, Maureen E. Thorson, and Nicole C. Hager, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Tubular Products Inc.

Barnett, Chief Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the 2019–2020 administrative review of the antidumping duty order on light-walled rectangular pipe and tube ("LWRPT") from the People's Republic of China ("China") for the period of review August 1, 2019, through July 31, 2020.  *See Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 87 Fed. Reg. 13,968 (Dep't Commerce Mar. 11, 2022) (final results of antidumping duty admin. review; 2019–2020) ("*Final Results*"), ECF No. 21-1, and accompanying Issues and Decision Mem., A-570-914 (Mar. 7, 2022) ("I&D Mem."), ECF No. 21-2.[1]

Plaintiff Hangzhou Ailong Metal Products Co., Ltd. ("Plaintiff") raises several challenges regarding Commerce's surrogate value selection for raw square tube.  *See* Confid. Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Mem."), ECF No. 25-1; Confid. Pl.'s Reply Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Reply"), ECF No. 39.

Defendant United States ("the Government") and Defendant-Intervenor Nucor Tubular Products Inc. ("Nucor") filed response briefs in support of Commerce's determinations regarding each contested issue.  *See* Def.'s Mem. in Opp'n to Pl.'s Rule

---

[1] The administrative record filed in connection with the Final Results is divided into a Public Administrative Record ("PR"), ECF No. 21-4, and a Confidential Administrative Record ("CR"), ECF No. 21-5.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF No. 42-1; Confid. J.A. ("CJA"), ECF Nos. 42-1 through 42-4.  Citations are to the CJA unless stated otherwise.

56.2 Mot. for J. Upon the Agency R. ("Def.'s Mem."), ECF No. 38; Confid. Resp. to Mot. for J. on the Agency R. ("Nucor's Mem."), ECF No. 33.

For the following reasons, the court sustains Commerce's *Final Results*.

## BACKGROUND

On October 6, 2020, Commerce initiated the 2019–2020 administrative review of the antidumping duty order on LWRPT from China at Plaintiff's request. *See Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 85 Fed. Reg. 63,081, 63,092 (Dep't Commerce Oct. 6, 2020); Req. for Admin. Review (Aug. 20, 2020), at 1, PR 1, CJA Tab 8. On October 22, 2020, Commerce issued an initial questionnaire to Plaintiff. *See* Req. for Info. (Oct. 22, 2020), PR 9, CJA Tab 9.

Pertinent to the matter before the court, the initial questionnaire requested that Plaintiff identify the raw materials that it used to produce the merchandise in question. *See id.* at D-1. In response, Plaintiff identified that the subject merchandise it produced had only one raw material—raw square tube. *See* Section D Quest. Resp. (Dec. 7, 2020) ("SDQR") at 18, PR 24, CR 11–15, CJA Tab 12. Commerce then issued a supplemental questionnaire requesting Plaintiff to clarify whether its reported factor of production—the raw square tube—was within the scope of the antidumping duty order on LWRPT that Plaintiff's exported merchandise was subject to. *See* Resp. to Section D. Suppl. Quest. (Mar. 30, 2021) ("Suppl. SDQR") at 7, PR 39, CR 23, CJA Tab 19. Plaintiff responded that the raw square tubes met the description of products within the scope of the antidumping order on LWRPT. *Id*. at 7–8. Plaintiff went on to explain that the raw square tubes were "intermediate inputs" and were subject to "significant further

Court No. 22-00116                                                                                                   Page 4

processing," such that the value of the exported subject merchandise substantially exceeded the price of the raw material input, and requested that Commerce calculate normal value based on its usage of this intermediate input. *Id.* at 8.

Commerce issued further supplemental questions requesting Plaintiff to identify the factors of production used to produce the raw square tube inputs and provide the consumption quantity for each. *See* Resp. to Section C&D Suppl. Quest. (Apr. 27, 2021) ("Second Suppl. SDQR") at 13, PR 60, CR 27–30, CJA Tab 26. Plaintiff identified hot-rolled carbon steel plates as the factor of production used to make the raw square tubes and provided databases that reported the consumption rate of hot-rolled carbon steel plates to produce one metric ton of the final subject merchandise. *See id.* at 13–14, Ex. D-26.

Because China is considered a non-market economy country for purposes of the antidumping duty law, Commerce requested comments on the selection of a primary surrogate country from which to value the factors of production. Req. for Econ. Dev., Surrogate Country, and Surrogate Value Cmts. and Info. (Mar. 18, 2021), PR 34, CJA Tab 15. Nucor urged Commerce to select either Malaysia or Brazil as the primary surrogate country and submitted Malaysian import data to value raw square tube. Cmts. on Surrogate Country Selection (Mar. 29, 2021) at 2–4, PR 38, CJA Tab 18; Submission of Surrogate Values (Apr. 5, 2021) at 2, Ex. 1, PR 47, CR 24–25, CJA Tab 21. Plaintiff did not initially advocate for any particular primary surrogate country, but provided Commerce with certain Romanian surrogate value data, including import data for raw square tube. *See* Submission of Surrogate Values (Apr. 5, 2021) at 1, Ex. SV-1,

PR 40–46, CJA Tab 20. Following Commerce's request that Plaintiff identify the factors of production for the raw square tube, Plaintiff submitted Russian surrogate value data for hot-rolled carbon steel plate obtained from Datamyne's Global Trade Analytics ("Datamyne") and urged Commerce to select Russia as the primary surrogate country. *See* 2nd Submission of Surrogate Values (Aug. 2, 2021) at 1, Ex. SV-12, PR 63–69, CJA Tab 27.

Nucor submitted rebuttal information regarding surrogate values and comments purporting to show the unreliability of the Russian surrogate value data. *See* Rebuttal Surrogate Value Info. (Aug. 12, 2021), PR 83, CJA Tab 30; Cmts. in Advance of the Dep't's Prelim. Results. (Aug. 6, 2021), PR 82, CR 31, CJA Tab 29. Specifically, Nucor provided five months of surrogate value data for Russian hot-rolled carbon steel plate obtained from the Global Trade Information Services database, commonly known as Global Trade Atlas ("GTA"), and the United Nations Commodity Trade Statistics database ("COMTRADE"). *See* Rebuttal Surrogate Value Info. at 2, Ex. 3.

For the preliminary results, Commerce selected Malaysia as the primary surrogate country because only the Malaysian data was sourced from GTA, "Commerce's preferred source for surrogate value data." Decision Mem. for the Prelim. Results of the 2019–2020 Antidumping Duty Admin. Review, A-570-914 (Aug. 31, 2021) ("Prelim. Decision Mem.") at 9–10, PR 103, CJA Tab 5 (stating that the submitted data was otherwise "equal in terms of being publicly available, contemporaneous with the period of review, broad market averages, from an appropriate surrogate country, and tax and duty-exclusive). Additionally, Commerce noted that the Malaysian data was

more specific to Plaintiff's factor of production because it contained surrogate value data for "square tube," *id.* at 9, while the Russian data contained only surrogate value data for hot-rolled carbon steel plate, *see* Prelim. Surrogate Value Mem. (Aug. 31, 2021) at 2, PR 105, CJA Tab 7.

In its case brief to Commerce, Plaintiff contested certain findings in the preliminary results. *See* Case Br. (Oct. 14, 2021), PR 114, CR 50, CJA Tab 32. Plaintiff contended that: (1) Commerce erred in using a surrogate value for raw square tube to value hot-rolled carbon steel plate; (2) in-scope merchandise, such as raw square tube, may not be designated as a factor of production; and (3) Commerce should select Russia as the primary surrogate country. *Id*. at 1–8.

For the *Final Results*, Commerce continued to determine normal value by using Plaintiff's consumption of raw square tube and a surrogate value for that input. I&D Mem. at 4. Commerce explained that it found the Russian Datamyne data to be unreliable and the Malaysian data for raw square tube to be the best available information to calculate normal value. *Id*. at 5. Commerce further explained that although the Malaysian data for square tube potentially included further processed square tube in addition to raw square tube, any potential double counting of processing factors of production was outweighed by the unreliability of the Russian Datamyne data. *Id*. at 6.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018).[2] The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

### I. Legal Framework for Surrogate Value Selection

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country, Commerce generally determines normal value by valuing the factors of production[3] used in producing the subject merchandise and adding "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" in a surrogate market economy country. *Id*. § 1677b(c)(1). However, if Commerce finds it is unable to determine the normal value using the factors of production with available information, the agency determines normal value on the basis of the price of comparable merchandise that is produced in one or more market economy countries

---

[2] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.
[3] The factors of production include, but are not limited to, hours of labor required; quantities of raw materials employed; amounts of energy and other utilities consumed; and representative capital cost, including depreciation. 19 U.S.C. § 1677b(c)(3).

that are at a comparable level of economic development as the nonmarket economy country. *Id*. § 1677b(c)(2).

In valuing the factors of production, Commerce must, "to the extent possible," use data from a market economy country that is "at a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer" of comparable merchandise. *Id*. § 1677b(c)(4). Commerce generally values all factors of production in a single country, *see* 19 C.F.R. § 351.408(c)(2) (excepting labor); *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1294 & n.3 (Fed. Cir. 2016), and "only resort[s] to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable," *Jiaxing Brother Fastener Co. v. United States*, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citation omitted), *aff'd*, *Jiaxing II*, 822 F.3d at 1289. Commerce "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Jiaxing II*, 822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)); 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available," "non-proprietary information" to value factors of production).

There is no hierarchy for applying the surrogate value selection criteria. *See, e.g.*, *United Steel & Fasteners, Inc. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398–99 (2020); *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 672, 387 F. Supp. 2d 1236, 1250–51 (2005) (stating that "the [c]ourt does not decide . . . whether contemporaneity should be valued over specificity"). Commerce

therefore has discretion to choose which criteria to emphasize in selecting "the best available information," so long as it does so in conformity with the substantial evidence standard. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). Commerce must articulate "a rational and reasonable relationship" between the surrogate value and "the factor of production it represents." *Globe Metallurgical, Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004) (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998)). Consistent with the court's standard of review and the discretionary, fact-specific nature of Commerce's determination, the court does not address "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300–01.

## II. Commerce's Surrogate Value Selection

Plaintiff raises a series of issues with the *Final Results*, but its contentions may be reduced to one discrete question: Was Commerce's determination to use Malaysian data to value raw steel tube supported by substantial evidence? To answer this question the court addresses two subsidiary decisions: (1) Commerce's decision to value raw steel tube as the main factor of production; and (2) Commerce's choice of data to value the raw steel tube.

### A. Whether "In-Scope" Materials May Be a Factor of Production

Plaintiff contends that 19 U.S.C. § 1677b does not permit Commerce to value as an input a product that is itself within the scope of the proceeding. *See* Pl.'s Mem. at

11–13; Pl.'s Reply at 12–18. The Government and Nucor argue that the statute does not limit what information Commerce may use to determine normal value. *See* Def.'s Mem. at 12–13; Nucor's Mem. at 10.

As the parties acknowledge, 19 U.S.C. § 1677b does not provide an exhaustive definition of "factors of production" or "raw materials." Nevertheless, Plaintiff contends that the statutory language and structure of the statute do not permit Commerce to select merchandise that would fall within the scope of the antidumping proceeding as a factor of production. Pl.'s Reply at 14. The court understands Plaintiff to argue that because the "factors of production" of subject merchandise include "raw materials," those raw materials necessarily cannot be materials that would fall within the description of merchandise subject to the antidumping proceeding. Plaintiff further contends that because the statute contains a separate provision to calculate normal value based on the market price of merchandise comparable to the subject merchandise, subject merchandise itself may not be a factor of production. *Id.* at 14–15. Plaintiff's arguments are unconvincing.[4]

First, nothing about the statutory language leads the court to find that the "raw materials" identified as a factor of production cannot be intermediate merchandise that also falls within the scope of the particular antidumping proceeding.[5] Merriam Webster

---

[4] As discussed above, Plaintiff *itself* reported raw square tube as a factor of production of the subject merchandise it exported to the United States. *See* SDQR at 18.
[5] Plaintiff's argument focuses on the dictionary definition of "factor of production" and the statutory inclusion of "raw materials" as an example of a "factor of production" to argue that a factor of production cannot itself fall within the scope of an antidumping

Dictionary defines "raw material" as "crude or processed material that can be converted by manufacture, processing or combination into a new and useful product." *Raw Material*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/raw%20material (last visited Apr. 11, 2023). Merchandise that falls within the scope of an antidumping proceeding, but is then further processed, falls within the dictionary definition of raw material and may be considered a factor of production.

Second, the fact that the exception to using factors of production involves using the market price of merchandise *comparable to the subject merchandise* does not preclude Commerce's approach. As Plaintiff concedes, the raw square tube it used to manufacture the imported subject merchandise was subject to "significant further processing," such that the value of the subject merchandise substantially exceeded the cost of the raw input material, and Plaintiff initially requested that Commerce calculate normal value using raw square tube as a factor of production. Suppl. SDQR at 8. To be clear, Commerce did not determine that the raw square tube used by Plaintiff as an input was comparable to the subject merchandise Plaintiff exported. The exception to the factors of production methodology involves determining the price at which merchandise comparable to the subject merchandise is sold in other countries and using that *as the normal value*, rather than to value an input for further processing. *See* 19 U.S.C. § 1677b(c)(1)–(2).

---

order. Pl.'s Reply at 13–14. As discussed herein, the court does not find this argument compelling.

Court No. 22-00116 Page 12

Plaintiff contends that it is Commerce's practice to value the factors of production of the "ultimate producer"—that is, the agency values the raw materials used by the producer that manufactures the intermediate in-scope merchandise that is further processed by a respondent before export to the United States. *See* Pl.'s Mem. at 11–12; Pl.'s Reply at 6–9. In support of this position, Plaintiff relies on Commerce's determinations in the tenth administrative review of the antidumping duty order on activated carbon from China ("*Activated Carbon From China*") and the sixth administrative review of the antidumping duty order on pasta from Italy ("*Pasta From Italy*"). *See* Pl.'s Reply at 6–9; *see also* Issues and Decision Mem. for Certain Activated Carbon From China, A-570-904 (Oct. 16, 2018) ("Activated Carbon I&D Mem."), https://access.trade.gov/Resources/frn/summary/prc/2018-22969-1.pdf (last visited Apr. 11, 2023); Issues and Decision Mem. for Certain Pasta from Italy, A-475-6818 (Feb. 3, 2004) ("Pasta I&D Mem."), https://access.trade.gov/Resources/frn/summary/italy/04-2862-1.pdf (last visited Apr. 11, 2023). Both of these determinations are inapposite.

In *Activated Carbon from China*, Commerce relied on adverse facts available ("AFA") when a respondent failed to provide the factors of production from the "ultimate producer" of subject merchandise. In that case, the respondent purchased its activated carbon from "Supplier X." Activated Carbon I&D Mem. at 5. Commerce requested that the respondent identify all producers of the merchandise under consideration, including the producers that sold to its suppliers (i.e., the "ultimate producers"). *Id*. at 5. The respondent reported activated carbon as a factor of production used by Supplier X, which purchased and further processed the activated carbon. *Id*. Commerce

requested, but the respondent did not provide, the factors of production for the upstream supplier to Supplier X.  *See* Decision Mem. for the Prelim. Results, A-570-904, (May 3, 2017) at 17, https://access.trade.gov/Resources/frn/summary/prc/2018-10649-1.pdf (last visited Apr. 11, 2023).  Because the respondent failed to supply the requested information, the agency determined to apply adverse facts available.  Activated Carbon I&D Mem. at 5–6.  Consequently, rather than supporting Plaintiff's argument, *Activated Carbon from China* stands for the proposition that Commerce may rely on AFA when a respondent fails to provide information requested by the agency but does not require the agency to rely on such information in all cases.

In *Pasta From Italy*, Commerce interpreted the term "cost of production" as used in 19 U.S.C. § 1677b(b)(1) to mean "the cost to produce . . . merchandise, not the cost of purchasing . . . merchandise."  Pasta I&D Mem. at 51.  Plaintiff's use of this Commerce determination to support its argument that the term "production" as used in the statute requires "transformation of the merchandise outside the scope of the order to merchandise within the scope of the order," Pl.'s Reply at 8, is unavailing for two reasons.  First, Commerce was applying a different subsection of 19 U.S.C. § 1677b applicable to market economy countries and, thus, is not indicative of Commerce's understanding of the term "factors of production" or its practice with regard to non-market economy countries.  *See* Pasta I&D Mem. at 50–51.  Second, Commerce's reason for excluding costs associated with purchased merchandise was that the respondent was "merely acting as a reseller" and did not further process the purchased

product. *Id*. at 51. Here, it is undisputed that the raw square tube used by Plaintiff is subject to significant further processing. Suppl. SDQR at 8; *see also* Pl.'s Reply at 11.

　　　Plaintiff also contends that *Zhengzhou Harmoni Spice Co. v. United States*, 33 CIT 453, 617 F. Supp. 2d 1281 (2009), supports its interpretation of 19 U.S.C. § 1677b(c). *See* Pl.'s Reply at 12, 15–17. In *Zhengzhou Harmoni*, however, the court found that the scope of the antidumping order covering fresh garlic did not include the "intermediate input," i.e., the raw garlic bulb. 33 CIT at 464–65, 617 F. Supp. 2d at 1294. The court did, however, explain that when Commerce uses an "intermediate input" to calculate normal value, the agency "must find a surrogate [value] representative of that intermediate product." *Id*. at 472, 617 F. Supp. 2d at 1300.[6] With that in mind, the court turns to whether Commerce's selection of Malaysian import data to value Plaintiff's raw square tube was supported by substantial evidence.

---

[6] In *Zhengzhou Harmoni*, the court addressed two distinct issues, both of which are relevant to this case. For the first issue, the court rejected the plaintiff's challenge to Commerce's decision to value the intermediate input, raw garlic bulb. *Id*. at 463–64, 617 F. Supp. 2d at 1293. Commerce determined to value the intermediate input because, although the respondents cultivated and harvested the raw garlic bulbs, Commerce found that the respondents did not accurately track and report all factors of production involved in cultivation and harvesting. *Id.* at 460–61, 617 F. Supp. 2d at 1291. Relevant here, respondents also objected that the intermediate input fell within the scope of the order. *Id.* at 464, 617 F. Supp. 2d. at 1293–94. The court disagreed, finding that the raw garlic bulb was not within the scope of the antidumping order. *Id.* at 464–65, 617 F. Supp. 2d at 1294. The second issue concerned whether Commerce's selection of a surrogate value for the raw garlic bulb was supported by substantial evidence. *Id*. at 466–73; 617 F. Supp. 2d at 1295–1301. The court found that when valuing an intermediate product, Commerce must select a surrogate value that is representative of that intermediate product. *Id*. at 472, 617 F. Supp. 2d at 1300. The court will return to this holding below, in section B.i.

### B. Whether Commerce's Use of Malaysian Surrogate Data to Value Raw Square Tube is Supported by Substantial Evidence and Otherwise In Accordance with Law

Plaintiff raises a number of issues with respect to Commerce's selection of Malaysian surrogate data to value raw square tube, none of which are convincing. Plaintiff first contends that the Malaysian data is not representative of the raw square tube it uses to produce subject merchandise. Pl.'s Mem. at 15–18; Pl.'s Reply at 11–12. Plaintiff next contends that use of the Malaysian data results in "double counting" of general expenses and profit. Pl.'s Mem. at 18–20. Finally, Plaintiff argues that Commerce should have used the Russian Datamyne data for hot-rolled carbon steel plate to calculate normal value. *Id*. at 20–21; Pl.'s Reply at 18–24.[7]

### i. Whether the Malaysian Surrogate Value Data is "Representative" of Plaintiff's Input

In addition to relying on *Zhengzhou Harmoni* to support its interpretation of 19 U.S.C. § 1677b(c), Plaintiff contends that the case holds that "a surrogate value for the

---

[7] Plaintiff contends that Commerce erred by first determining that the best available surrogate value information was the Malaysian raw square tube data and then selecting raw square tube as the factor of production. *See* Pl.'s Reply at 4–5. To the contrary, Commerce explained that it was appropriate to utilize the factors of production "as reported by" Plaintiff and that the subject merchandise "was a finished product produced by [Plaintiff] from square tube material." I&D Mem. at 4; *see also* Prelim. Surrogate Value Mem. at 2 (explaining that because Plaintiff "described its [factor of production]" as "raw square tube," Russian import data "for [Harmonized Tariff Schedule ("HTS")] code 7208.54" covering "flat-rolled iron or nonalloy steel" was not specific to Plaintiff's input). Commerce acknowledged that it had asked for, and Plaintiff had provided, factor data for hot-rolled carbon steel plates; however, Commerce noted that it "did not utilize this database in the *Preliminary Results*"—supporting the inference that Commerce determined which factor of production to use before determining what data was the "best available" to value that factor. I&D Mem. at 5–6.

final product is *not representative* of the value of any factor of production utilized in producing the final product" and, thus, Commerce should not have used the Malaysian import data for raw square tube to value the raw square tube used by Plaintiff to produce the subject merchandise. Pl.'s Reply at 17. Plaintiff misunderstands *Zhengzhou Harmoni*. In *Zhengzhou Harmoni*, the court remanded to Commerce its selection of a surrogate value for an intermediate garlic product. *See* 33 CIT at 467–73, 617 F. Supp. 2d at 1296–1301. The court remanded this determination not because it found that an intermediate product within the scope of the antidumping order could *never* be a surrogate value for a factor of production of the subject merchandise, but because its selection "was largely speculative and conclusory, and lack[ed] adequate [record] support." *Id*. at 470, 617 F. Supp. 2d at 1298. In other words, the court was unable to find that the surrogate value selected was applicable to the factor of production Commerce sought to value.

      Here, there is no reason to believe that the Malaysian data is not representative of the raw square tube used by Plaintiff to manufacture the subject merchandise. Plaintiff concedes that the raw square tube Plaintiff used to manufacture its LWRPT would be included in the import data under Malaysian HTS subheading 7306.61. *See* Prelim. Surrogate Value Mem. at Attach. 1; *see also* Pl.'s Mem. at 16 ("[B]oth the unprocessed LWRPT and the processed LWRPT are classified under [HTS subheading] 7306.61 . . . .").

### ii. Whether Commerce Impermissibly "Double Counted" General Expenses and Profit

Plaintiff next contends that Commerce inflated Plaintiff's dumping margin by "double counting" general expenses and profit because those values were also included in the surrogate value for raw square tube. *See* Pl.'s Mem. at 18–19. The fact that the Malaysian surrogate value data for raw square tube may include both raw square tube and further processed square tube is not contested. What is contested is whether Commerce acted within its discretion in selecting this imperfect data set as the best available information when compared to other record data.

The court finds that despite the deficiency in the Malaysian data, Commerce's selection is supported by substantial evidence. Although Commerce's explanation is not as thorough as it could be, the court can discern the agency's path of reasoning. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Having found that the Russian data was completely unreliable due to discrepancies in that data discussed in the next section, Commerce reasonably determined that the possibility of "double counting" general expenses and profit associated with selection of the Malaysian data would not be as distortive in the calculation of normal value as would use of the Russian data. *See* I&D Mem. at 6.

### iii. Whether Commerce Impermissibly Rejected the Russian Datamyne Data

Finally, Plaintiff contends that Commerce unlawfully rejected the Russian surrogate value data for hot-rolled carbon steel plate. Pl.'s Mem. at 20–21; Pl.'s Reply at 18–25. Plaintiff first argues that this was the only record information for valuing its

factors of production because surrogate value data for raw square tube is not lawful. Pl.'s Mem. at 20. As discussed above in section II.A, this contention is meritless.

Furthermore, Plaintiff has waived its argument that the Datamyne data must be used because it was the only available information on the record with which to value hot-rolled carbon steel plates. Plaintiff first made this argument in its reply brief; thus, Plaintiff failed to raise the issue in its opening brief before this court. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). Plaintiff merely stated in its moving brief that "[e]ven if *arguendo* Commerce could justify its rejection of the Russian [surrogate value], such rejection would have resulted in an inadequate record for calculating the normal value under the default method." Pl.'s Mem. at 21. Rather than raising a substantive argument regarding the Datamyne data, this passing mention set up Plaintiff's argument that Commerce should have determined normal value using the alternative method, i.e., the price of comparable merchandise from a surrogate country. S*ee id*.

Even if Plaintiff had properly raised this issue, the argument fails on its merits because Commerce's determination to reject the Russian data is supported by substantial evidence. Parties submitted three sets of Russian steel plate data to Commerce: Datamyne, GTA, and COMTRADE. *See* I&D Mem. at 5. The GTA and COMTRADE data matched precisely with respect to the declared value and quantity of

steel, while the Datamyne data differed significantly. *Id*. The declared value of the Datamyne data was "much lower" than the value of the GTA and COMTRADE data. *Id*.; *see also* [Nucor's] Rebuttal Br. (Oct. 25, 2021) at 9, PR 117, CR 51, CJA Tab 33 (detailing that the declared value of the Datamyne data was less than two thirds of the value of the declared value in the GTA and COMTRADE data). Given the inconsistencies in the Datamyne data, Commerce reasonably found this data unreliable.

## CONCLUSION

For the foregoing reasons, the court will sustain Commerce's *Final Results*. Judgment will enter accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: April 11, 2023
New York, New York